IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

**UNITED STATES OF AMERICA**

**v.**  CRIMINAL NO. 2:15-00124

**CHADWICK J. LUSK**

**MEMORANDUM IN SUPPORT OF FACTUAL BASIS**
**FOR DEFENDANT'S PLEA TO HONEST-SERVICES MAIL FRAUD**

Now comes the United States of America, by Larry R. Ellis, Assistant United States Attorney, and in response to this Court's Order of November 18, 2015, submits this Memorandum in support of a factual basis for defendant's prospective plea of guilty to an "honest-services" mail fraud charge.

**BREACH OF FIDUCIARY DUTY**

The first step in proving that defendant intended to breach his duty to Mingo Logan Coal Company is to define the duty in question and establish its existence in this context.

In ruling that 18 U.S.C. § 1346 may be used to prosecute honest-services mail fraud cases involving bribery and kickbacks, the Supreme Court noted the "solid core" of honest-services mail fraud cases that existed before the *McNally* decision involved bribes and kickbacks, not only in the public or governmental sphere, but in the private sector as well. *Skilling v. United States*, 561 U.S. 358, 408 (2010). In

support, the *Skilling* Court cites, *inter alia*, *United States v. deVegter,* 198 F. 3d 1324, 1327-1328 (11th Cir. 1999) which includes a clear restatement of the applicability of the honest-services theory in the private sector:

> [i]n the private sector, **purchasing agents**, brokers, union leaders, and others with clear fiduciary duties to their employers or unions [were] found guilty of defrauding their employers or unions by accepting kickbacks or selling confidential information.

*Id.* at 1327 (emphasis added).

Private-sector honest-services cases may be distinguished from those based on governmental corruption in that the fiduciary duty involved in a private, employer-employee relationship is not based in statutory law, but rather:

> may stem from an employment relationship of the sort that imposes discretion and consequently obligations of loyalty and fidelity on the employee.

*Id.* at 1329 n.5.

The *deVegter* Court, in turn, cites to *United States v. Frost*, 125 F.3d 346 (6th Cir. 1997), where, in affirming convictions of private-sector employees under an honest-services fraud theory, the Court observed:

> It is axiomatic that an employee has a fiduciary duty to protect the property of his employer. *See e.g. Carpenter*, 484 U.S. 19, 27, 108 S.Ct. 316, 321 (employee has a fiduciary duty to protect and not exploit confidential business information of employer); see generally Restatement (Second) of Agency § 1 (1958) (defining "agency" as "the fiduciary relation which results from the manifestation of

2

consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act").

*United States v. Frost,* 125 F.3d 346, 366 (6th Cir. 1997).

In this case, the existence of such a duty could not be clearer.[1] Defendant here was not a laborer or mailroom attendant. He was his employer's purchasing agent. As such, he was invested with precisely that type of discretion that creates a fiduciary relationship. His value to the company was in his exercise of his discretion in the purchase of goods and services required for the company's ongoing production and profit. The company was paying him to exercise that judgment with the company's interest in mind, unalloyed by self-dealing and self-interest. Courts faced with such a dynamic have had no trouble in finding that a fiduciary relationship existed and that the defendant, in taking bribes or kickbacks, violated that duty. *United States v. Rybicki*, 354 F.3d 124, 139 (2nd Cir. 2003)(collecting cases).

While the court in *United States v. Vinyard*, 266 F.3d 320 (4th Cir. 2001), states that under the "reasonable foreseeability" test, there must be proof that the defendant

---

[1] In fact, defendant has stipulated that he was employed by Mingo-Logan Coal Company as a purchasing agent and that, in such capacity, he owed the Company a fiduciary duty. (Stipulation of Facts, p. 1 ECF No. 5.) He admits there that he directed Mingo Logan business to CM Supply Company "in exchange for . . . kickbacks" paid to him by the vendor.

3

intended to breach his fiduciary duty, it is not implied that he must have contemplated that intent in formal legal terms. ("Although defendants may not have known that the legal designation of their actions would be 'scheming to deprive the University of its intangible right to the honest-services of its employees,' there is sufficient evidence that all defendants committed or aided and abetted in that crime.") *Frost*, 125 F.3d at 369. Rather, even in those cases employing the "reasonable foreseeability" test, the question of the defendant's intent to breach the duty is not separately analyzed. In cases decided under the "reasonable-foreseeability" test, the intent to breach the duty is established by proving that the duty existed and that the defendant intended to do the acts charged in violation of that duty:

> Thus, the reasonably foreseeable harm test is met whenever, at the time of the fraud scheme, the employee could foresee that the scheme potentially might be detrimental to the employer's economic well-being . . . Therefore, so long as the employee could have reasonably foreseen the risk to which he was exposing the employer, the requirements of § 1346 will have been met.

*See* also *Frost*, 125 F.3d at 367-68 applying the reasonable-foreseeability test and affirming convictions under a jury instruction that included:

> If you find that the nondisclosure of a conflict of interest by [defendants] furthered a scheme by them to abuse the trust of their employer in a manner that made an identifiable harm to [the defendant's

4

> employer] reasonably foreseeable, <u>then you may find that [defendants] had the intent to defraud</u> under Section 1341.
>
> The key determination is whether you can find from the evidence . . . that [defendants] might reasonably have contemplated or understood that [their employer] would suffer some harm to its business arising out of or resulting from [their conduct] . . .

*Id.* (emphasis added).

Here the defendant had a duty to make purchases for his employer considering solely the company's best interests and not his own self-interest in the transactions. That much is inherent in his position with the company. Nonetheless, he acted in contravention of that duty by agreeing to insinuate his own personal stake into every transaction with the crib-block supplier. ("Mr. Lusk, as purchasing agent, provided favorable actions to Mr. Roeher and his company by selecting Mr. Roeher's company to provide crib blocks at Mingo Logan, in exchange for those kickbacks." Stipulation of Facts p. 1.) His intent to break his fiduciary duty is established by proof of his knowing actions in contravention of that duty.

### **FORESEEABILITY OF HARM TO THE EMPLOYER**

*Vinyard* makes it clear that there is no need in this case to prove any actual harm – financial or otherwise – to the victim company and no need to prove that the defendant intended harm. ("The reasonably foreseeable harm test neither requires an actual economic loss nor an intent to economically harm the

5

employer." *Vinyard* at 329.) Rather, the issue is whether an effect "detrimental to the employer's economic well-being" could have been foreseen. Thus, the "foreseeable harm" contemplated here may be theoretical or potential, as it was in *Vinyard*. Moreover, it is not necessary to show that the defendant himself actually foresaw the potential harm. The test for foreseeability is an objective one and is not dependent on the defendant's state of mind. The question is not "was the potential harm actually foreseen," but rather, was the potential harm "reasonably foreseeable."

Thus, the "foreseeability" question for this case may be stated:

> When an employee of a company, who has been hired for the purpose of making purchases for that company and to negotiate those purchases in a way that is most advantageous to the production and profit of the company, agrees with a certain vendor to receive a kickback from that vendor of 7.5% of the purchase price in every transaction between the employer-company and that vendor in return for that agent selecting that vendor, and to conceal his receipt of those kickbacks from his employer, is it reasonably foreseeable that the employer-company, as a result of that relationship between the purchasing agent and the kickback-paying vendor, risks the possibility of economic harm.

Courts considering similar facts have consistently found that the potential or "risk" of economic harm for the employer was in fact foreseeable. In *Vinyard,* the court finds a foreseeable risk of "sub-optimal outcome" regardless of whether

6

the transactions between the defendant and the company "were objectively fair." *Vinyard*, 266 F.3d at 330. The court there reasoned that the defendant, in concealing his personal interests in certain transactions with the company, "deprived [the employer] of the chance to consider a variety of brokers and to search for the best possible price." *Id.* Indeed, the court in *Vinyard* recognized that while the services provided by the defendant may have been optimal, it was also "possible that [it was] not, and the possibility of a suboptimal outcome was reasonably foreseeable to [the defendant]." *Id.*

Likewise, in *United States v. Fagan*, 821 F.2d 1002 (5th Cir. 1987), the Fifth Circuit considered the effect of kickbacks paid to an employee on a company (applying the materiality test, rather than the reasonably foreseeable test). In *Fagan*, the defendant-vendor paid a company's employee $100 per day per boat that the company rented from defendant, equating approximately $165,000 over less than three years. *Id.* at 1005. The Court found that the agreement between the defendant-vendor and the company's employee deprived the company of information regarding how much money defendant actually would have accepted for the boat rentals. The Court explained that the arrangement between defendant and the employee prevented the company from "captur[ing] for itself the large sums that [employee] was secreting because [company] would have known that [defendant-

7

vendor] was willing to lease his boats for less," which "had some economic value." *Id.* at 1009. As the court explained, the kickback scheme "was calculated to deprive [company] of this economic benefit." *Id.* at 1010.

The Seventh Circuit Court of Appeals has also considered the effect of a kickback scheme on a company's ability to negotiate the best possible price. *United States v. George*, 477 F.2d 508 (7th Cir. 1973). In *George*, the Court noted that the employee's duty was to "negotiate the best price possible" for a company or at least tell the company that the vendor was willing to sell the goods "for substantially less money." *Id.* at 512-13. While the Seventh Circuit also applied the materiality test, the Court found that "there was a very real and tangible harm to [company] in losing the discount or losing the opportunity to bargain with a most relevant fact before it." *Id.* at 513. The Court reasoned in *George* that, although the profits to the vendor were within the normal range for vendors of that company, "nothing would have prevented [company] from bargaining with [vendor] for a lesser profit margin." *Id.* at 513. Furthermore, the Court pointed out that "if the substantial payments . . . were not designed to compromise [employee's] fiduciary duties to [company], why were they not made directly and openly . . ?" *Id.* at 514.

8

Roeher estimates that he paid Lusk approximately $230,000 between 2009 and March 2014. While Lusk may dispute that number, he does not deny that he received kickbacks from Roeher for the crib-block purchases. It follows logically that, subtracting the 7.5% kickbacks, Mingo Logan could have negotiated for a better price with CM Supply, Co. had Mingo Logan been equipped with all the facts that Lusk knew. However, Mingo Logan did not know that Lusk obtained the cash from Roeher, and it was reasonably foreseeable to Lusk that keeping the kickback information from Mingo Logan kept Mingo Logan from negotiating the best possible price with CM Supply, Co.

The kickback arrangement between Lusk and Roeher also created a risk that, as purchasing manager, Lusk would not seek better prices on crib blocks from other vendors. While the United States has no information indicating that any of the Mingo Logan vendors providing supplies during the relevant time period delivered better prices on crib blocks than CM Supply, Co., the kickbacks paid to Lusk gave him a dis-incentive to seek other vendors that may have offered lower prices than Roeher's company. Other companies may have been willing to provide the same crib blocks at a better price, yet there was no incentive for Lusk to seek better prices due to the kickback arrangement.

A kickback arrangement also creates an incentive for the corrupt employee to keep other relevant information from the

employer. In *Sears Roebuck & Co. v. American Plumbing & Supply Co.*, 19 F.R.D. 334 (E.D. Wis. 1956), a company sued the principal of a supplier that was paying bribes to one of the company's employees. While a civil case, the Court, in considering whether the defendant intended the payments as gifts or had a fraudulent intent in making the payments, recognized that the "[p]ayment of secret commissions under such circumstances can have one purpose, namely, that of making the agent of the adverse party beholden to the person giving the secret commissions." *Id.* at 343. Kickback arrangements create an economic risk because they create an incentive for the employee to withhold economically-relevant information from the employer, such as a vendor providing substandard services, like faulty crib blocks or late deliveries.

Here, the kickback agreement between Lusk and Roeher created a reasonably foreseeable economic risk that, given his personal profit from each transaction with CM Supply, Lusk would be biased toward that company, and consequently, not inform Mingo Logan if CM Supply, Co. provided shoddy crib blocks or made late deliveries. Such actions are not alleged here, but the economic risk is inherent in a kickback scheme such as the one at issue.

**CONCLUSION**

For the foregoing reasons, the United States submits that by accepting kickbacks, Lusk intentionally breached his fiduciary duty to Mingo Logan, and furthermore, the arrangement between Lusk and Roeher created a reasonably foreseeable economic risk to Mingo Logan.

Respectfully submitted,

R. BOOTH GOODWIN II
United States Attorney

By:
/s/Larry R. Ellis
LARRY R. ELLIS
Assistant United States Attorney
WV Bar No.1122
300 Virginia Street, East
Room 4000
Charleston, WV 25301
Telephone: 304-345-2200
Fax: 304-347-5104
Email:larry.ellis@usdoj.gov

CERTIFICATE OF SERVICE

It is hereby certified that the foregoing "Memorandum in Support of Factual Basis for Defendant's Plea to Honest-Services Mail Fraud" has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing this 2nd day of December, 2015, to:

    Thomas W. Smith, Esquire
    405 Capitol Street
    Suite 701
    Charleston, West Virginia 25301

    /s/Larry R. Ellis
    LARRY R. ELLIS
    Assistant United States Attorney
    WV Bar No.1122
    300 Virginia Street, East
    Room 4000
    Charleston, WV 25301
    Telephone: 304-345-2200
    Fax: 304-347-5104
    Email: larry.ellis@usdoj.gov