IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

_____x
                                :
UNITED STATES OF AMERICA,        :          Criminal Action
                                :
             Plaintiff,          :          No.  2:15-cr-00124
                                :
v.                               :
                                :          Date:  January 19, 2016
CHADWICK J. LUSK,                :
                                :
             Defendant.          :
_____x


TRANSCRIPT OF HEARING HELD BEFORE
THE HONORABLE THOMAS E. JOHNSTON, JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

APPEARANCES:

For the Government:        AUSA LARRY ELLIS
                          U.S. Attorney's Office
                          P.O. Box 1713
                          Charleston, WV  25326-1713


For the Defendant:         THOMAS W. SMITH, ESQ.
                          Suite 701
                          405 Capitol Street
                          Charleston, WV 25301




Court Reporter:            Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

1       PROCEEDINGS had before The Honorable Thomas E. Johnston,

2   Judge, United States District Court, Southern District of West

3   Virginia, in Charleston, West Virginia, on January 19, 2016, at

4   10:00 a.m., as follows:

5       COURTROOM DEPUTY CLERK:  The matter before the Court is

6   the United States of America versus Chadwick Lusk, criminal

7   action number 2:15-cr-00124, scheduled for a hearing regarding

8   the factual basis of the proposed plea agreement.

9       THE COURT:  Good morning.  Will counsel please note

10   their appearance?

11       MR. ELLIS:  Your Honor, Larry Ellis for the United

12   States, and with me at counsel table is Seth Summers.

13       MR. SMITH:  Good morning, Your Honor.  Tom Smith, and

14   with me is the defendant, Chadwick Lusk.

15       THE COURT:  All right.  Good morning.  I have been --

16   the reason I called this hearing is that I've been carefully,

17   very carefully, reviewing the potential factual basis in this

18   case.  One of the reasons it's taken so long is because,

19   initially, I didn't think there was one, and I thought for a long

20   time that I may be throwing this one out, too, and so -- but the

21   more I take a look at it, the more I think it might be there.

22   So, that explains the passage of time.

23    I have some questions for you today and I want to hear from

24   you on these specific questions.  And then my intent, frankly, as

25   much as anything, to organize my thoughts on this rather complex

charge, is to write an opinion about the factual basis and,
around the same time that I put out that opinion, assuming I find
a factual basis, take a plea hearing -- or do a plea hearing.
That's my plan.

I'm thinking, too, that at the time of that plea hearing, at
the latest, I will probably be inquiring as to whether or not
there would be a waiver of the Speedy Trial Act given the passage
of time that we've had.

Does anybody have any comments on any of that?

MR. ELLIS:  No, Your Honor.

MR. SMITH:  No, Your Honor.

THE COURT:  All right.  Can I --

MR. SMITH:  I'm sorry.  We would waive -- execute any
waiver of the Speedy Trial Act the Court deems necessary.

THE COURT:  All right.  Very well.  Well, as I've
repeatedly indicated, I don't think a prospective waiver of the
Speedy Trial Act is appropriate under the *Zedner* Supreme Court
case.  However, at the time of the plea hearing, I will probably
make that inquiry, and I appreciate that sentiment.

Well, let me get right to it then.  The -- one of the issues
in this case has been who the employer is, who was owed the
fiduciary duty, and who is paying for the stuff that was obtained
through the contract in question.  In this case, my understanding
is that the product obtained is crib block; is that correct?

MR. ELLIS:  Yes, Your Honor.

1          MR. SMITH:  Yes, Your Honor.

2          THE COURT:  All right.  Now, at times, it's been

3   indicated -- actually, this is a point of confusion, because the

4   Government's most recent brief said that Mountain Laurel paid for

5   the crib blocks.  And, Mountain Laurel, as I understand it, is

6   just a mine site.  It's just the name of the mine.  It's not a

7   company, which left considerable uncertainty as to who was paying

8   for these crib blocks.  So, my first question is, who was paying

9   for the crib blocks?  Was it Arch?  Was it Mingo Logan?

10         MR. SMITH:  Mingo Logan, Your Honor.

11         MR. ELLIS:  May I have a moment, Your Honor?

12         THE COURT:  You may.

13     (Pause.)

14         MR. SMITH:  That's certainly our understanding.

15         MR. ELLIS:  Yes.  We agree, Your Honor, Mingo Logan.

16         THE COURT:  And is that -- was that the case throughout

17  the entire period in question?

18         MR. ELLIS:  Yes, Your Honor.

19         MR. SMITH:  May I have one moment, Your Honor?

20     (Pause.)

21         MR. SMITH:  Yes, Your Honor.

22         THE COURT:  Do you have some documentation that shows

23  that?

24         MR. ELLIS:  May I, Your Honor?

25     (Pause.)

1       MR. ELLIS: Your Honor, Mr. Rowley informs me that he

2  believes we have the actual checks. He does not have them with

3  him and organized at this moment, but that's his memory, and I

4  believe he has made a spreadsheet or a summary of those checks,

5  and the checks would be from Mingo Logan; is that correct, the

6  checks from the cribs blocks phase.

7       THE COURT: All right. Maybe what I will ask you to do

8  is file that documentation after the hearing so that I can review

9  it. And, by the way, I'm not -- I mean, I want counsel to

10  understand, I'm not questioning -- I'm not questioning your

11  veracity here, but I've come to the conclusion that I don't take

12  things for granted. You all would have no reason to know that I

13  threw out two pleas last fall the day before the sentencings when

14  I realized that there was no -- in one case, there was no factual

15  basis; in the other case, there was no legal basis. It was a

16  prohibited person case and it turned out to be that the guy

17  wasn't prohibited. So, I don't take anything for granted

18  anymore, and I'm aggravated by that, but it's the reality that I

19  live in now, so I want to see it.

20       MR. ELLIS: Yes, Your Honor. We understand.

21       MR. SMITH: Yes, sir.

22       THE COURT: All right. Well, that -- I had anticipated

23  that potentially the way that the rest of this case has gone that

24  the answer to that question may very well have been that Arch was

25  paying for the crib blocks, in which case, we would have gotten

into some rather thorny issues about what the reasonably foreseeable economic harm would be, but it seems to be -- it simplifies things considerably if Mingo Logan was paying for the crib blocks.

All right.  Now, one of the reasons I'm going to write an opinion on this is that there's a variety of pieces to this honest services fraud theory and most of the cases that you'll read about will focus on one of the pieces, but you will be hard pressed to find an opinion that puts all the pieces together so that you can have a full picture of what this charge looks like.

And I will editorialize here and I think -- I don't think that this sentiment is necessarily at odds with the Supreme Court's view of this type of charge.  This thing is so complicated and so unwieldy, that I question the wisdom of having it as a theory.  I think the Supreme Court did that, too, and tried to get rid of it and Congress said, no, no, we want to keep it, and I think then, the Supreme Court, in *Skilling*, did what it could to cabin it to kickbacks and bribes, which does seem to make it a little bit more clear, but the law around it is just so complicated and I'm going to -- my opinion is going to lay out all of this so that it's a little bit more clear and, by my count, and you'll see this in the opinion, I think there's actually about eight pieces to this that have to come together.

My remaining questions have to do with one or two of the other pieces that have to do with breach of fiduciary duty, an

1   intent to breach fiduciary duty.  My first question is, and I

2   have an idea of what the answer is to this, but I want to make

3   sure we're on the same page about it because it impacts two

4   different pieces of this, and that is, what exactly is the

5   fiduciary duty that was breached here?

6           MR. ELLIS:  Your Honor, if I might, the fiduciary duty

7   is -- I guess it's finally -- finally rests in the law of agency.

8           THE COURT:  I'm not talking about the fiduciary

9   relationship.

10          MR. ELLIS:  Okay.

11          THE COURT:  Because I actually think *Skilling* answers

12  that question.  *Skilling* gives an example of employee/employer

13  relationship as a relationship where a fiduciary -- where a

14  fiduciary obligation exists.  So, I'm not questioning that he had

15  a fiduciary relationship with his employer, but --

16          MR. ELLIS:  What was the duty?

17          THE COURT:  What exactly was the duty?  And that's an

18  important question because, not only did there have to be a duty,

19  it had to be breached, and a separate piece is that the defendant

20  intended to breach a fiduciary duty, which is a whole other can

21  of worms that I want to get to but, to me, in order to answer any

22  of those questions, we have to be on the same page as to what

23  exactly the duty was that was breached.  I'll help you out here a

24  little bit.  I'll tell you what I think it is and then you can

25  tell me if you agree or don't agree.

1       I believe that -- or I think -- and I'm not going to go so

2   far as to say I believe, at this point, but I think the fiduciary

3   duty that was breached, is that the defendant had a duty not to

4   accept kickbacks and, if he did accept kickbacks, he had a duty

5   to disclose that to his employer.

6           MR. ELLIS:  Yes, Your Honor, and maybe to talk about

7   the duty, the particular duty that's at hand here in a different

8   way, we could maybe say that he had a duty to negotiate the best

9   price for his employer and a duty to inform his employer of all

10  facts that were relevant to that price.  One fact relevant to

11  that price would, of course, be that he was receiving seven and a

12  half percent back.

13          THE COURT:  Okay.  That seems like another way of

14  phrasing what I said.

15          MR. ELLIS:  Yes, Your Honor.  That's what I meant it to

16  be.

17          THE COURT:  Okay.  All right.

18      Mr. Smith?

19          MR. SMITH:  Your Honor, I hope the Court understands

20  the difficult position this puts me in, but I wouldn't

21  necessarily disagree with the Government's characterization.

22          THE COURT:  What about my characterization?

23          MR. SMITH:  I would agree with the Court's.  More from

24  our end, if I may, his job and the nature of it was to obtain

25  necessary material for mining of coal at that particular site at

the best price, depending upon availability, and we will concede
that when he was approached by Mr. Roeher, who was willing to
give him money, which would have lowered -- could potentially
have lowered the cost to Mingo Logan, that it was anticipated by
his employer that he would bring that to their attention and, in
the context of his obligation to provide -- get the materials
they need at the best price, which I think is consistent with
what the Court is saying.

THE COURT:  Well, that sounds more consistent with what
the Government said than what I said, but I think we're probably
all singing from the same sheet of music, just maybe playing a
different instrument.  Is that -- that's actually a terrible
metaphor, but run that by me again one more time, Mr. Smith.

MR. SMITH:  Well, his job was, as purchasing agent, was
to get material necessary for the extraction of coal at the best
price.  Sometimes, it would depend.  There might be a variance
that we don't believe is relevant here based on availability and
quality of materials, but that was his duty to Mingo Logan and,
once Mr. Roeher evidenced a willingness to give Mr. Lusk money,
then reasonably, a person in Mr. Lusk's position would have
understood that the company could have gotten it cheaper because
Mr. Roeher presumably was making a profit, even giving him the
money he gave.

THE COURT:  Okay.  All right.  Well, then the next
question I have is, what is the evidence -- I believe that one of

1    the things that the Government has to prove here is that the

2    defendant intended to breach the fiduciary duty.  Now, I think

3    it's fair to say that "fiduciary duty" is a legal term and that

4    this defendant may or may not have even understood what the term

5    "fiduciary duty" meant at the time of these events, but I'm not

6    sure that that makes a whole lot of difference.  So, my question

7    is, what is the evidence that the defendant intended to breach

8    the fiduciary duty?

9          MR. ELLIS:  Your Honor, if I might, I believe that the

10    record as it now exists before the Court is sufficient to

11    establish that not only did the defendant -- not only was the

12    defendant in a fiduciary relationship with the victim, and not

13    only did he have a particular fiduciary duty within that

14    relationship that was affected by his actions here, but that he

15    knew of it.  He may not have called it that, but he knew he was

16    supposed to be faithful to his employer.  He knew his job was to

17    negotiate the best terms and, knowing that, he took these

18    kickbacks knowing that this is money that could have gone to the

19    company.  This is money that, you know, if -- if they're willing

20    to pay me seven percent, if I took my seven percent out, they

21    could have sold it to the company for seven percent less.  That's

22    just logic.  And the defendant has admitted that he's aware of

23    that.

24    Now, how much further do we have to go?  And I think the

25    answer to that is not at all.  I think that a close reading of

*Vinyard* and cases cited in *Skilling* more or less say that, even under this test, even under the reasonably foreseeable test, which may be a little tighter than the materiality test, even under the reasonably foreseeable test, what you need to do is establish that he knew he had a duty and that his act, you know, the acts that he intentionally -- the intent is, did he intentionally do the acts and, yes, the record before the Court shows that he intentionally took these bribes, took these kickbacks.  Did he intentionally do those?  And then, were the acts that he intentionally did violative of the duty?

In other words, the cases, even *Vinyard*, doesn't really say, you know, I'm thinking I -- I think I'll violate my duty today. It's more in terms of, I know I have this duty.  Anybody in their right mind who is a purchasing agent knows that this duty exists. For crying out loud, that's why they pay me.  And then I do intentional -- I intentionally do acts that I know are violative of that duty.  Then, the intent element is met, and I don't think we have to go any further than that, and I think that that is -- that is a -- manifests not only in *Vinyard* --

And, you know, the Court has already pointed out one error in my brief, and I'll point out another.  On Page 4 of my brief, there is a block quote, and it says this, "The reasonably foreseeable harm test is met whenever, at the time of the fraud scheme, the employee could foresee that the scheme potentially might be detrimental to the employer's economic well-being."  We

1    have that.  That's here.

2        Therefore, so long as the employee could have reasonably

3    foreseen the risk to which he was exposing the employer, which he

4    has admitted now, he has admitted that.  I think he admitted that

5    in the first statement of fact.  He has certainly admitted it in

6    the memo he filed in anticipation of this hearing.  As long as an

7    employee could have reasonably foreseen the risk, the

8    requirements of 1346 will have been met.

9        And what's wrong with my brief?  I don't put the cite there.

10    And the cite is actually from *Vinyard*.  That's a quote from Judge

11    King in *Vinyard*.

12        And then we go on to look at *Frost,* where a jury instruction

13    that says essentially what I'm arguing to the Court now, that if

14    you've -- if you find that he did -- that the defendant did these

15    acts intentionally, knowing he had this duty, that's enough.

16    That's enough to satisfy.

17        And, you know, I also want to say, Your Honor, that it so

18    often happens, I guess it happens to other people, but it so

19    often happens to me that when I go back and review my work a

20    month or so after I've done it, I think, why did I leave

21    something out?  And I wonder this, and I know the Court is -- has

22    given this great study, and I wish I had said this in my brief,

23    but when you look at *Skilling*, and when you look at *Vinyard*,

24    Judge King and the Supreme Court are aiming at exactly the same

25    target.  There's no question.  They are both aiming at a way that

we can limit the application of 1346.  Both Courts know this thing could be -- you could open Pandora's Box here and we need to find a way to limit them.

And, Judge King, in *Vinyard,* says, we're going to adopt this reasonably foreseeable test because that's a way we can make this just applicable to things, and even use this word, I believe, Your Honor, just the more substantial things.  We don't want this trivial stuff.  We don't want somebody, you know, who put down a wrong number on a time sheet.  We don't want it to go that far. We want substantial cases.

And I think that is exactly what the Supreme Court was wrestling with in *Skilling*, but the way the Supreme Court resolved it was not so much, we're going to adopt the reasonably foreseeable test, we're going to adopt the materiality test. They just said, bribes and kickbacks, we're going to draw the line there.

And I wonder, Your Honor, does that supersede all of this wrestling around with this test and that test at the Fourth Circuit level?  Might we read *Skilling* to supersede that and simply say, if we have a duty, and if we have bribes and kickbacks, that's it?

THE COURT:  That's an interesting point I hadn't thought of.  So, you're saying that, in addition to cabining this to bribes and kickbacks, that *Skilling* could also be read to streamline and smooth the path of all of these -- of all of these

other cases which, frankly, is a large part of what I've

struggled with, is case law that does not appear -- that does not

appear to be explicitly overruled or otherwise made irrelevant by

*Skilling*, other bits and pieces that still might apply, even in a

bribe or kickback case, and you're saying that *Skilling* should be

read to simply streamline all that, that the taking of bribes and

kickbacks in this context, essentially touches all those bases?

MR. ELLIS:  I'm saying, Your Honor, that it would not

surprise me at all if a Court would adopt that and there

certainly is a lot of logic in it.  There certainly is a lot of

practicality in it.  When you read *Skilling*, you know, chapter

and verse, bribes and kickbacks, that's always been the heart of

it.  Those cases have never been overruled.  Well, *McNally*, but

the bribes and kickbacks, that's the heart of 1346 and, if we

limit it to bribes and kickbacks, we solve the problem that Judge

King was wrestling with in *Vinyard*.  We're not dealing with

trivialities.  We're dealing with good old garden variety federal

crime, maybe even, might even be that interstate commerce was

actually affected, but -- but, you know, I think there is a great

appeal and a great deal of simplification that could take place

if we -- if we said, you know, the Supreme Court has answered

this now.  When we are worried about the triviality versus

significance, we look to the Supreme Court's opinion in *Skilling*,

and they say, bribery and kickbacks, that's enough, that's where

it rests, that's where we limit 1346.  We're constitutional.

1    We're good to go.

2              THE COURT:  Mr. Smith, do you agree with that?

3              MR. SMITH:  Your Honor, the Court hit on a salient

4    point vis-a-vis the intent to violate the duty of honest

5    services.  That was not an issue here.  He did not do that.

6         But what he did do was intentionally engage in the conduct

7    of accepting the money and he knowingly failed to disclose that

8    to his employer and I want to honor my agreement with the

9    Government but, at some point, I feel like I'm begging the Court

10   to convict my client, but I --

11             THE COURT:  Well --

12             MR. SMITH:  I think, when you look at and you read

13   *Vinyard,* and there's a cite to *Frost*, if that's said, rather than

14   intend to violate one's duty of honest services, it said, "Engage

15   in conduct which would clearly violate that," and we don't have a

16   problem, and I -- to that extent, I agree with the Government

17   that if you're engaging in conduct that is inconsistent with your

18   understanding of what your job is and it causes, in this case, an

19   extra cost to the Government with regard to the money that could

20   be saved because of the difference the company is being charged

21   as reflected in the money he received and you don't disclose

22   that, you know, being candid with the Court, that's always been

23   my understanding of honest services, quite frankly.

24             THE COURT:  Well, I want to say a couple of things to

25   that.  Number one, I learned years ago that I don't take guilty

pleas where the factual basis is disputed.  That's why we -- I'm
sorry.  I don't take guilty pleas where the factual basis is
disputed.  That's why we have trials.

So, I don't think you -- if -- Mr. Smith, I don't think you
should feel so bad, if your client is committed to this plea
agreement and this plea, the idea, the theory behind that, is
that you and the Government are on the same page, at least to the
extent of the factual basis for the plea.  So, to that extent, I
don't think you should feel bad about arguing the factual basis.

To go on to the substance of what you said, I think that --
I think that it would be ridiculous to say that, in order to
prove this, the Government would have to show that, at the time
he was taking the bribes and kickbacks, the defendant was
actually thinking, I am hereby depriving my employer of honest
services, or I am hereby breaching a duty, a fiduciary duty I
have, to my employer.

So, I think really, the question is, it goes more to the
substance of the transaction than that, and I think what we've
articulated is that, in addition to my formulation of it, maybe
the total formulation of it that we've come up with here today is
that the duty breached was, A., the defendant knew he had a duty
to get the best deal on the crib blocks as the purchasing agent
for his employer; B., he understood that he had a duty not to
take kickbacks; and, C., that he understood at some level that,
if he was taking kickbacks, that would be information that his

1    employer would want to know and that he had a duty to disclose

2    and, of course, he obviously wasn't going to do that if he was

3    taking the kickbacks to begin with, but he would understand that,

4    and that, obviously, he breached all of those duties along the

5    way.  Is that -- are we on the same page on that, at least?

6              MR. SMITH:  Yes, Your Honor.

7              MR. ELLIS:  Yes, Your Honor.

8              THE COURT:  All right.  I didn't place him under oath.

9    Maybe I should.

10        Mr. Lusk, will you please stand, and I will ask the deputy

11   clerk to administer an oath to you at this time.

12             COURTROOM DEPUTY CLERK:  Please raise your right hand.

13             **CHADWICK J. LUSK, DEFENDANT, SWORN**

14             THE COURT:  You may be seated.

15        Mr. Lusk, I just want to ask you, you just heard me

16   summarize what I think your duties to your employer were, and did

17   you understand those to be your duties at the time that this was

18   happening?

19             THE DEFENDANT:  Yes, sir.

20             THE COURT:  All right.  Excuse me just a moment.

21        (Pause.)

22             THE COURT:  All right.  I think -- I think I've covered

23   everything I need to cover with you all today.

24        Do you all have anything to add on this?

25             MR. ELLIS:  Nothing from the Government, Your Honor.

1        MR. SMITH:  Nothing on behalf of Mr. Lusk, Your Honor.

2        THE COURT:  All right.  Well, here's the time frame I'm

3   looking at.  I've got -- I've got quite a number of matters

4   pending on my calendar over the next month or so that are going

5   to be taking my attention.  So, my time frame on this is that I

6   will probably set this for a plea hearing, assuming my final

7   analysis, I find a factual basis, probably looking at setting a

8   plea hearing toward the end of February.  That will coincide with

9   my hopefully concluding all the sentencings on what I call the

10  "water cases", which are going to take up some time and attention

11  over the next month.  So, my thought would be to set a plea

12  hearing probably toward the end of February.

13      Mr. Smith, I know you typically have some obligations

14  elsewhere during this time of year.

15      MR. SMITH:  And those obligations are growing like

16  mushrooms in the dark, Your Honor.  If I could beg the Court's

17  indulgence, the session is over the 13th of March, if that's not

18  too far away.  If it could be set after that, I would really

19  appreciate it.

20      THE COURT:  We can probably do that.

21      MR. SMITH:  Thank you, Your Honor.

22      THE COURT:  That's -- I think, Mr. Ellis, your theory

23  that *Skilling* should be read to streamline the test on this is an

24  interesting one.  My question is going to be, do you have any

25  cases that say that, because I'm pretty sure *Skilling* does not

1　explicitly say that, or are you asking me to walk out on that

2　limb?

3　　　　　MR. ELLIS:  Your Honor, I don't have a case.  I don't

4　know that the Fourth Circuit has spoken on this issue

5　post-*Skilling*, on the issue of which test applies, but I -- but

6　when you read -- and so, I guess I'm asking the Court to step

7　out.  When you read *Skilling*, and when you read Judge King's

8　opinion in *Vinyard*, it's just obvious that they are both reaching

9　for the same goal.

10　　　　　THE COURT:  Uh-huh.

11　　　　　MR. ELLIS:  Now, is it possible that the Fourth Circuit

12　would say, yes, we -- of course, we'll abide by the Supreme

13　Court's test in *Skilling*, but we have our own test besides that

14　and, you know, so there are two hurdles.

15　　　　　THE COURT:  Well, I think -- I think the problem is

16　that there's more than one piece to this.  In fact, there's a

17　bunch of pieces.  Like I said, I identified at least eight

18　elements to this and, by the way, I'm not going to be sitting in

19　my chambers drumming my thumbs and hoping for the next honest

20　services case to come along, just so you know.

21　　　But it seems to me that *Skilling* gets to one of the pieces

22　directly, but there's several other pieces, as well.  And, you

23　know, I -- trust me.  I see the appeal here.  If I were king for

24　a day, I'd get rid of this, frankly, because I think it's

25　unwieldy and difficult, and I have the same concerns that Judge

1    King -- many of the same concerns I suspect Judge King and the

2    Supreme Court had in *Skilling*, but Congress gets the final say on

3    that, and I don't, and I'm not king for a day, in any event.

4         But what you're suggesting has -- has some appeal to me but,

5    on the other hand, this may not be the best case to do that in

6    because, the chances are, it's going to end here.

7         MR. ELLIS:  Yes, Your Honor.

8         THE COURT:  Given that we have a guilty plea, the

9    chances are that sort of thing is not going to find its way to

10    the Fourth Circuit for a review and a more final analysis, but if

11    you've got something that -- you know, if you've come up with

12    something in the meantime --

13         MR. ELLIS:  Yes, Your Honor.

14         THE COURT:  -- that suggests that approach, or maybe

15    another circuit is taking that approach, trust me, if we can't

16    get rid of this thing, I would love to simplify it, because it is

17    not simple the way it is.

18         MR. ELLIS:  Your Honor, we will -- we will keep our

19    feelers out on that point and, I guess, if I might, I wonder if

20    *Skilling* could be read to say that where there are bribery --

21    where there is either bribery or a kickback, that the intent is

22    inherent in that criminal act.  That is such a malum in se act

23    that the intent is inherent in that and that's all the farther we

24    need to go.

25         THE COURT:  Well, I understand the argument.  I think

1    that, right now, it's a good argument and --

2          MR. ELLIS:  Right.

3          THE COURT:  You're going to have to -- you know,

4    getting a Court to agree to that, it looks like that's me in this

5    case, at least, is another matter, but I understand -- I

6    understand the argument.

7          MR. ELLIS:  Your Honor, and I will say this.  I do

8    believe that, even if you apply the most stringent test, even if

9    you apply the test that Judge King adopted in *Vinyard*, this

10    record passes muster.

11          THE COURT:  I understand.

12     All right.  Anything else we need to take up today?

13          MR. ELLIS:  No, Your Honor.

14          MR. SMITH:  No, Your Honor.  Thank you.

15          THE COURT:  All right.  Thank you.

16     (Proceedings concluded at 10:36 a.m., January 19, 2016.)

17

18    CERTIFICATION:

19     I, Ayme A. Cochran, Official Court Reporter, certify that

20    the foregoing is a correct transcript from the record of

21    proceedings in the matter of United States of America, Plaintiff

22    v. Chadwick J. Lusk, Defendant, Criminal Action No.

23    2:15-cr-00124, as reported on January 19, 2016.

24

25    s/Ayme A. Cochran, RMR, CRR          January 21, 2016

Ayme A. Cochran, RMR, CRR                          DATE