IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

               Plaintiff,

v.                                    CRIMINAL ACTION NO. 2:15-cr-00124

CHADWICK LUSK,

               Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is the factual-basis determination for Defendant's proposed plea. For the reasons provided herein, the Court **FINDS** that there is a factual basis for Defendant's proposed plea.

## *I.   Background*

This case arises out of a fraudulent scheme orchestrated around the Mountain Laurel Mining Complex ("Mountain Laurel").   Mountain Laurel is owned by Mingo Logan Coal Company ("Mingo Logan"), which, in turn, is a wholly owned subsidiary of Arch Coal, Inc. ("Arch Coal").   (ECF No. 5, Ex. B at 1.)

Defendant worked at Mountain Laurel between "approximately late 2006 to March 2014." (*Id.*)   "Beginning sometime around 2009," Defendant "was employed by [Mingo Logan]" as "a purchasing agent at Mountain Laurel."   (*Id.*)   "Part of his duties as purchasing agent required [Defendant] to order parts and products needed in the Mountain Laurel operations."   (*Id.*)

1

CM Supply, Co. ("CM Supply"), "which was owned and operated by Gary Roeher, was a parts vendor for Mountain Laurel."  (*Id.*)  "Among other products, . . . Roeher sold crib blocks to Mountain Laurel."  (*Id.*)

"Beginning sometime around September 2009, . . . Roeher began paying [Defendant] a portion of the profit that CM Supply received on the sale of crib blocks to Mountain Laurel."  (*Id.*) Defendant, "as purchasing agent, provided favorable official action to . . . Roeher and [CM Supply] by selecting [CM Supply] to provide crib blocks at Mountain Laurel . . . in exchange for those kickbacks" (the "Scheme").  (*Id.*)

"Going forward, [Defendant] would issue, as needed in the coal mining operations of Mountain Laurel, a purchase order for crib blocks to CM Supply."  (*Id.* at 2.)  "CM Supply would deliver the crib blocks and then mail an invoice . . . , generally at the end of the month."  (*Id.*) "After receipt of payment, . . . Roeher . . . calculate[d] the amount of money owed" to Defendant "as part of the [Scheme]."  (*Id.*)

For example, "on or about November 15, 2011, . . . Roeher mailed a CM Supply invoice from near his home in Holden, Logan County, . . . for payment for a load of 1,800 crib blocks." (*Id.*)  Roeher knew "that a portion of the profits" for this sale "was going to be returned to [Defendant] for directing the sale to [Roeher]."  (*Id.*)

Mingo Logan's parent company, Arch Coal, paid the invoices sent by CM Supply from a "concentrated" account, which Arch Coal used to pay the "payables of [its] several subsidiaries." (ECF No. 12 at 3; *see, e.g.*, ECF No. 12, Ex. 1 (constituting a July 2, 2009 check from Arch Coal to CM Supply).)  "[I]mmediately upon payment, the entries for these payouts were transferred to the corporate books of [Mingo Logan]."  (ECF No. 12 at 3.)

"As a general practice, . . . Roeher usually paid [Defendant] seven-and-one-half percent . . . of the crib block sales price."  (ECF No. 5, Ex. B at 2.)  "Roeher estimates that between September 2009 until at least March 2014, he paid [Defendant] approximately $230,000 in cash kickbacks as part of the [Scheme]."  (*Id.*)  Defendant "concealed and covered up his participation in the [S]cheme from Mingo Logan . . . , Arch Coal, and its representatives," such as by "receiv[ing] the cash kickbacks from . . . Roeher at locations away from Mountain Laurel to avoid the detection of their [S]cheme."  (*Id.*)

On June 2, 2015, the Government filed a single-count Information against Defendant, which charges him with honest-services mail fraud and aiding and abetting in violation of 18 U.S.C. §§ 1341, 1346, and 2.[1]  (ECF No. 1 at 4; *see also id.* (alleging, in part, that "[o]n or about November 15, 2011," Defendant, "together with . . . Roeher, . . . for the purpose of executing the [S]cheme, . . . did knowingly cause to be delivered by mail . . . an invoice for crib blocks from CM Supply addressed to Mountain Laurel").)  The Information alleges, in part, that Defendant "together with . . . Roeher . . . and others known and unknown to the United States Attorney, devised and intended to devise a scheme and artifice to defraud and deprive Mingo Logan . . . of its right to the honest and faithful services of [Defendant]."[2]  (*Id.* at 2.)  On November 18, 2015,

---

[1] Although § 2 is charged, the facts as stipulated appear to support the Defendant's culpability as a principle, and the following opinion reflects that approach.  Just as all federal indictments implicitly include a charge under 18. U.S.C. § 2, *see United States v. Rashwan*, 328 F.3d 160, 165 (4th Cir. 2003) (citing *United States v. Dodd*, 43 F.3d 759, 762 n.5 (1st Cir. 1995)), a defendant charged with aiding and abetting may nonetheless be found guilty as a principle.  *See United States v. Pope*, No. 94-10310, 1994 WL 708770, at *1 (5th Cir. 1994) (noting that differing language within the plea agreement and the indictment was irrelevant because "[f]ederal law ascribes the same level of culpability to both" the criminal act itself and aiding and abetting the act, meaning that they are "not separate or different offenses").

[2] This is the second case the Government has filed against Defendant relating to the Scheme.  On May 30, 2014, the Government filed a previous single-count Information against Defendant, which similarly charged him with honest-services mail fraud and aiding and abetting in violation of 18 U.S.C. §§ 1341, 1346, and 2.  *United States v. Lusk*, Criminal Action No. 2:14-cr-00116, ECF No. 1 (S.D. W. Va.).  This previous Information alleged that Defendant deprived Arch Coal of his honest services.  *Id.*  On July 21, 2014, Defendant pled guilty to the charge contained in this single-count Information.  *Id.*, ECF No. 4; *see also id.*, ECF No. 8 (constituting Defendant's plea agreement, in which he agreed to plead guilty to the charge contained in the May 30, 2014 single-count Information).  On April 21,

the Government filed a plea agreement wherein Defendant agrees to plead guilty to the charge in the single-count Information. (ECF No. 5.) This plea agreement is signed and initialed by Defendant and includes an attached Stipulation of Facts. (*See id.*; *id.*, Ex. B (Stipulation of Facts).)

On November 18, 2015, the Court entered an order directing the parties to file briefing regarding the factual basis for the proposed plea. (ECF No. 6.) The parties separately filed briefing in response to this order on December 2, 2015. (ECF Nos. 7 & 8.) The Court then held a hearing regarding the factual basis for the proposed plea on January 19, 2016. (ECF No. 10; *see also* ECF No. 11 (constituting the transcript of the January 19, 2016 hearing in this case).) Following this hearing, the Government filed supplemental briefing regarding the factual basis for Defendant's proposed plea. (ECF No. 12.) Thus, the issue of whether there is a factual basis for Defendant's proposed plea is fully briefed and ready for disposition.[3]

---

2015, the Court entered an opinion directing "the parties to file briefing regarding whether Defendant owed a fiduciary duty to Arch Coal sufficient to satisfy the fiduciary duty prerequisite of honest services mail fraud." *United States v. Lusk*, Criminal Action No. 2:14–cr–00116, 2015 WL 1808909, at *5 (S.D. W. Va. Apr. 21, 2015). Subsequently, on June 1, 2015, the Government filed a Notice of Dismissal, in which it dismissed the May 30, 2014 Information without prejudice. *United States v. Lusk*, Criminal Action No. 2:14-cr-00116, ECF No. 25 (S.D. W. Va.). The Court granted leave for the filing of the Notice of Dismissal on June 2, 2015. *Id.*, ECF No. 26.

[3] On February 4, 2016, the Court entered an order directing the parties to file briefing "addressing whether the Court should proceed with the determination of whether there is a factual basis for the proposed plea in this case prior to the Supreme Court issuing its decision in [*McDonnell v. United States*, No. 15-474], or hold this matter in abeyance pending the *McDonnell* decision." (ECF No. 13.) On February 12, 2016, the Government filed a responsive brief in which it stated that it "ha[d] no objection to the Court[] holding this matter in abeyance until the publication of the Supreme Court's opinion in *McDonnell*." (ECF No. 14 at 1.) The Government further stated that defense counsel "authorized" the Government "to represent to the Court that [Defendant] is in agreement with this response" to the Court's February 4, 2016 order. (*Id.* at 2.) By its order entered on February 19, 2016, the Court stayed this case "until the Supreme Court release[d] its decision in *McDonnell*." (ECF No. 15.)

On June 27, 2016, the Supreme Court issued its decision in *McDonnell v. United States*, 136 S. Ct. 2355 (2016). Subsequently, on July 8, 2016, the Government filed a Motion to End Stay. (ECF No. 16.) As the basis for the stay in this case was resolved by the Supreme Court issuing its decision in *McDonnell*, the Court **GRANTS** the Government's Motion to End Stay, (*id.*), and **LIFTS** the stay of this action.

## II.  Legal Standard

"A voluntary and intelligent plea of guilty is an admission of all the elements of a formal criminal charge and constitutes an admission of all material facts alleged in the charge."  *United States v. Willis*, 992 F.2d 489, 490 (4th Cir. 1993) (citations omitted).   Nonetheless, Federal Rule of Criminal Procedure 11 provides that, "[b]efore entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea."   Fed. R. Crim. P. 11(b)(3).   "[T]he Rule ensures that the court make clear exactly what a defendant admits to, and whether those admissions are factually sufficient to constitute the alleged crime."  *United States v. DeFusco*, 949 F.2d 114, 120 (4th Cir. 1991) (citing *United States v. Fountain*, 777 F.2d 351, 355 (7th Cir. 1985), *cert. denied sub nom. Granger v. United States*, 475 U.S. 1029 (1986)).   "The requirement to find a factual basis is designed to 'protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within the charge.'"  *United States v. Mastrapa*, 509 F.3d 652, 660 (4th Cir. 2007) (quoting Fed. R. Crim. P. 11 advisory committee's notes (1966)).

"In determining whether a guilty plea has a factual basis, the district court need not rely only on the Rule 11 plea colloquy."  *Id.*   Rather, the court "may conclude that a factual basis exists from *anything* that appears on the record."  *Id.* (emphasis added) (quoting *DeFusco*, 949 F.2d at 120).   "This Court regularly relies upon undisputed facts and inferences arising therefrom taken from stipulations of fact, direct inquiry to defendants during Rule 11 hearings, and information in presentence reports to which no objection is made in assessing the factual basis for pleas."  *United States v. Dixon*, --- F. Supp. 3d ---, Criminal Action No. 2:14-cr-00236, 2016 WL

5

3248508, at *4 (S.D. W. Va. June 13, 2016).   "This list is by no means exhaustive, as the factual basis may be found from anything in the record."   *Id.* (citing *Mastrapa*, 509 F.3d at 660).

"[T]he district court . . . 'need only be subjectively satisfied that there is a sufficient factual basis for a conclusion that the defendant committed all of the elements of the offense.'"   *United States v. Ketchum*, 550 F.3d 363, 366 (4th Cir. 2008) (quoting *United States v. Mitchell*, 104 F.3d 649, 652 (4th Cir. 1997)).   However, defendants do not have an "absolute right to have a guilty plea accepted" and the "court may reject a plea in exercise of sound judicial discretion." *Santobello v. New York*, 404 U.S. 257, 262 (1971).   "The trial court has wide discretion in determining whether a factual basis exists."   *United States v. Morrow*, 914 F.2d 608, 611 (4th Cir. 1990) (citing *United States v. Lumpkins*, 845 F.2d 1444, 1451 (7th Cir. 1988)).

### III.  Background on the Honest-Services Doctrine

The honest services iteration of mail and wire fraud has a long and strained history.   "The federal mail fraud statutes were first enacted in 1872 as part of a recodification of the postal laws to protect citizens from the use of the mails in furtherance of schemes to defraud."   *United States v. Mandel*, 862 F.2d 1067, 1071 (4th Cir. 1988) (citations omitted).   "[T]he original mail-fraud provision . . . proscribed, without further elaboration, use of the mails to advance 'any scheme or artifice to defraud.'"   *Skilling v. United States*, 561 U.S. 358, 399 (2010) (citation omitted).   "In 1909, Congress amended the statute to prohibit, as it does today, 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'"   *Id.* at 399–400 (emphasis omitted) (quoting 18 U.S.C. § 1341).   "Emphasizing Congress' disjunctive phrasing, the Courts of Appeals, one after the other, interpreted the term 'scheme or artifice to defraud' to include deprivations not only of money or property, but also of

intangible rights," thereby giving rise to an honest-services theory of mail and wire fraud.  *Id.* at 400; *see also Mandel*, 862 F.2d at 1071 (noting that "the lower federal courts began expanding the scope of the rights protected by § 1341 to include certain intangible rights" in the 1970s (citations omitted)).  "Unlike fraud in which the victim's loss of money or property supplied the defendant's gain, . . . the honest-services theory targeted corruption that lacked similar symmetry." *Skilling*, 561 U.S. at 400 (citation omitted).  "While the offender profited, the betrayed party suffered no deprivation of money or property; instead, a third party, who had not been deceived, provided the enrichment." *Id.*; *cf. United States v. Pelisamen*, 641 F.3d 399, 406 (9th Cir. 2011) (stating that "the crime of honest-services fraud was initially created by courts . . . to cover cases of fraud that are more complex or subtle than those in which the defendant steals money or tangible property from the victims" (citation omitted)).  "Even if the scheme occasioned a money or property *gain* for the betrayed party, . . . actionable harm lay in the denial of that party's right to the offender's honest services." *Skilling*, 561 U.S. at 400 (citation omitted).  "Most often these cases . . . involved bribery of public officials, but courts also recognized private-sector honest-services fraud." *Id.* at 401 (citation omitted); *see also United States v. Vinyard*, 266 F.3d 320, 326 (4th Cir. 2001) ("Although the honest services theory of mail fraud is directed primarily at the deterrence and punishment of corruption among public officials, the courts have consistently recognized the statute's province to encompass dishonest acts perpetrated in private commercial settings." (citing *United States v. Martin*, 228 F.3d 1, 17 (1st Cir. 2000))).  *See generally id.* ("This recognition of liability within the private sector comprehends that a corporate officer or other private employee may bear a duty of loyalty to his employer, just as a public official owes the citizenry a duty to govern honestly and impartially."); *United States v. Morris*, No. CRIM.A. 2:03–

00275, 2004 WL 1242736, at *2 (S.D. W. Va. June 4, 2004) ("Over time, honest services fraud was recognized as applying to four categories of defendants: (1) government officials who defraud the public of honest services; (2) elected officials and campaign workers who defraud the electorate of the right to an honest election; (3) private actors who abuse fiduciary duties; and (4) private actors who defraud others of certain intangible rights." (citing *United States v. Handakas*, 286 F.3d 92, 101–02 (2d Cir. 2002))).

In 1987, the Supreme Court "stopped the development of the intangible-rights doctrine in its tracks," *Skilling*, 561 U.S. at 401, and found that the mail fraud statute, 18 U.S.C. § 1341, was "limited in scope to the protection of property rights," *McNally v. United States*, 483 U.S. 350, 360 (1987), *superseded by statute*, Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4508, *as recognized in Skilling*, 561 U.S. at 402.   The Supreme Court noted that "[i]f Congress desires to go further, it must speak more clearly than it has."   *McNally*, 483 U.S. at 360.   "Congress responded swiftly" and, in 1988, "it enacted a new statute 'specifically to cover one of the intangible rights that lower courts had protected . . . prior to *McNally*: the intangible right of honest services.'"   *Skilling*, 561 U.S. at 402 (quoting *Cleveland v. United States*, 531 U.S. 12, 19–20 (2000)).   "In effect, the statute restored the mail fraud statute to its pre-*McNally* position and incorporated those decisions of the courts of appeals recognizing an intangible right to honest services."   *United States v. Nelson*, 712 F.3d 498, 506 (11th Cir. 2013) (citations omitted).

## IV.   *Discussion of the Charged Offense*

The Information alleges that Defendant committed an honest-services iteration of mail fraud and aiding and abetting in violation of 18 U.S.C. §§ 1341, 1346, and 2.   (ECF No. 1 at 4.) Section 1341 provides the statutory basis for mail fraud and states the following, in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice . . . , places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing . . .

shall be guilty of an offense against the United States.   Section 1346 provides that, for purposes of the mail fraud statute, "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."   "[T]he elements of a mail fraud scheme involving the deprivation of honest services are identical to those of a normal mail fraud prosecution."   *United States v. Vinyard*, 266 F.3d 320, 326 (4th Cir. 2001).   "The elements of mail fraud under 18 U.S.C. § 1341 are: (1) the existence of a scheme to defraud; (2) the use of the mails in furtherance of the scheme; and (3) a material statement or omission in furtherance of the scheme."   *United States v. Gibbs*, 132 F. App'x 502, 503 (4th Cir. 2005) (citations omitted); *cf. United States v. Loayza*, 107 F.3d 257, 260 (4th Cir. 1997) ("The essential elements of mail fraud are '(1) the existence of a scheme to defraud, and (2) the mailing of a letter, etc., for the purposes of executing the scheme.'"); *Vinyard*, 266 F.3d at 326 ("[T]he elements of mail fraud are '(1) the existence of a scheme to defraud, and (2) the mailing of a letter, etc., for the purposes of executing the scheme.'" (quoting *United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1404 (4th Cir. 1993))).

The Court notes that this statement of the elements for an honest-services mail fraud offense—while providing the overarching framework for the offense's requirements—does not do

9

justice to the current state of the law surrounding this offense.   Following Congress' resuscitation of the honest-services theory of fraud in 1988, "judicial interpretation of the 'honest services' doctrine has . . . limited its scope."   *Vinyard*, 266 F.3d at 326.   In particular, courts placed additional restrictions on the honest-services theory of fraud to limit the potentially expansive reach of this doctrine.   *See, e.g.*, *Skilling v. United States*, 561 U.S. 358, 403 (2010) ("Alert to § 1346's potential breadth, the Courts of Appeals have divided on how best to interpret the statute."); *United States v. Sorich*, 523 F.3d 702, 706 (7th Cir. 2008) ("[G]iven the amorphous and open-ended nature of § 1346, courts have felt the need to find limiting principles . . . ." (citations omitted)); *cf. Sorich v. United States*, 129 S. Ct. 1308, 1310 (2009) (Scalia, J., dissenting) ("Without some coherent limiting principle to define what 'the intangible right of honest services' is, whence it derives, and how it is violated, this expansive phrase invites abuse by headline-grabbing prosecutors . . . .").   *See generally United States v. Rybicki*, 354 F.3d 124, 135 (2d Cir. 2003) ("We would, we think, labor long and with difficulty in seeking a clear and properly limited meaning of 'scheme or artifice to deprive another of the intangible right of honest services' simply by consulting a dictionary for the literal, 'plain' meaning of the phrase.").

There appear to be no cases in the Fourth Circuit that fully elucidate the present elements for an honest-services mail fraud offense under the theory presented in the instant case—an allegation that a defendant employee deprived their private-sector employer of its right to the defendant's honest services.   Instead, cases seem to focus on discrete elements, rather than addressing the total assemblage of elements arising from disparate case law.   In addition, a review of the cases that address honest-services mail fraud indicates that the requirements for this offense vary widely depending on numerous factors, such as the applicable court of appeals, whether the

10

context is public or private sector, and, in the private-sector context, whether the defendant is the employee of the harmed entity or a third party. *See, e.g.*, *Vinyard*, 266 F.3d at 327–29 (addressing "the honest services doctrine in the private employment context," noting that the courts of appeals are divided as to whether to apply a "reasonably foreseeable harm" test or a "materiality" test, and adopting the former test); *Rybicki*, 354 F.3d at 162 (Jacobs, J., dissenting) ("[T]here is now wide disagreement among the circuits as to the elements of the 'honest services' offense.").

Nonetheless, case law establishes that—in the Fourth Circuit and in the context of an honest-services mail fraud offense where the defendant was the employee of the allegedly harmed private-sector entity—the following extensive list encompasses the present elements for an honest-services mail fraud offense: (1) the existence of a fraudulent scheme, *see, e.g.*, *Gibbs*, 132 F. App'x at 503 (citations omitted); (2) this fraudulent scheme "depriv[ed] another of honest services through bribes or kickbacks supplied by a third party who had not been deceived," *Skilling*, 561 U.S. at 404; (3) the defendant employee owed a fiduciary duty to the harmed private-sector entity, *see, e.g.*, *United States v. Evans*, Criminal Action No. 2:14–cr–00113, 2015 WL 1808904, at *4 (S.D. W. Va. Apr. 21, 2015); (4) the defendant "employee intended to breach a fiduciary duty," *Vinyard*, 266 F.3d at 327 (citation omitted); (5) the defendant "employee foresaw or reasonably should have foreseen that his employer might suffer an economic harm as a result of the breach," *id.* (citation omitted); (6) the defendant employee "acted with specific intent to defraud," *United States v. Ham*, 998 F.2d 1247, 1254 (4th Cir. 1993) (citation omitted); (7) the fraudulent scheme must include a "materiality of falsehood," *Neder v. United States*, 527 U.S. 1, 25 (1999); and (8) the use of the mails in furtherance of the scheme, *e.g.*, *Gibbs*, 132 F. App'x at 503 (citation omitted).   The Court addresses each of these elements, in turn.

11

## A.    Existence of a Fraudulent Scheme

The first element of an honest-services mail fraud offense is a requirement that is applicable to any mail fraud offense under 18 U.S.C. § 1341—the existence of a fraudulent scheme. *See, e.g.*, *United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003) ("Whether alleging a deprivation of property or honest services or both, a mail or wire fraud indictment must allege a scheme to defraud, an intent to defraud, and use of mail or wire." (citation omitted)). *See generally United States v. Vinyard*, 266 F.3d 320, 326 (4th Cir. 2001) ("[T]he elements of a mail fraud scheme involving the deprivation of honest services are identical to those of a normal mail fraud prosecution.").   "While both the mail-fraud and wire-fraud statutes use the phrase 'scheme to defraud,' neither statute defines what a 'scheme to defraud' is." *United States v. Pendergraft*, 297 F.3d 1198, 1208 (11th Cir. 2002) (citations omitted).   "Instead, the meaning of 'scheme to defraud' has been judicially defined." *Id.* (citation omitted).

The Supreme Court stated that "Congress intended to incorporate the common-law meaning of the term 'fraud' in the mail fraud, wire fraud, and bank fraud statutes." *Neder*, 527 U.S. at 23 n.7; *see, e.g.*, *United States v. Perry*, 757 F.3d 166, 176 (4th Cir. 2014) ("In considering whether there existed a scheme to defraud, [courts] must look to the common-law understanding of fraud . . . ." (citations omitted)); *United States v. Brumley*, 116 F.3d 728, 734 (5th Cir. 1997) (stating that "the scheme or artifice to defraud elements . . . . are familiar terms of federal criminal law generating and drawing their sustenance from federal common law").   "[T]he words 'to defraud' commonly refer to wronging one of his . . . rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane, or overreaching." *United States v. Coyle*, 943 F.2d 424, 427 (4th Cir. 1991) (citation omitted).   "Of course, the fraud

12

statutes do not cover all behavior which strays from the ideal, and not all conduct that strikes a court as sharp dealing or unethical conduct is a 'scheme or artifice to defraud.'" *United States v. Colton*, 231 F.3d 890, 901 (4th Cir. 2000) (citations omitted).  As such, "[t]o establish the existence of a scheme to defraud, the government must show that the defendant failed to disclose material information or made material misrepresentations," *United States v. Gillion*, 704 F.3d 284, 296 (4th Cir. 2012) (citation omitted), or "affirmative[ly] conceal[ed]" information, *United States v. Tomblin*, Criminal Action No. 2:10–cr–00130, 2011 WL 829268, at *3 (S.D. W. Va. Mar. 7, 2011).

Under a failure-to-disclose theory, "[a] scheme or artifice to defraud . . . may arise from a failure to disclose material information pursuant to a . . . legal duty."  *United States v. Titus*, 475 F. App'x 826, 835 (4th Cir. 2012) (citing *Colton*, 231 F.3d at 898); *see also Chiarella v. United States*, 445 U.S. 222, 228 (1980) ("At common law, . . . . one who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so.").  Of course, "a duty to disclose material information need not necessarily be based upon the existence of some statute or regulation prescribing such a duty."  *United States v. Mandel*, 591 F.2d 1347, 1363 (4th Cir.), *overruled on other grounds by* 602 F.2d 653 (4th Cir. 1979).  "Rather, the duty to disclose may exist because of the relationship between the one possessing the material information and another, for example, employer-employee; public official-public body."  *Id.*; *see also Tomblin*, 2011 WL 829268, at *4 ("[A] disclosure duty . . . can arise from fiduciary relationships, statutes, or other legal relationships . . . ." (citing *Colton*, 231 F.3d at 898)).

13

Additionally, "even in the absence of a fiduciary, statutory, or other independent legal duty to disclose material information, common-law fraud includes acts taken to . . . create a false impression, mislead, or otherwise deceive in order to 'prevent[] the other [party] from acquiring material information.'" *Colton*, 231 F.3d at 898 (alterations in original) (quoting Restatement (Second) of Torts § 550 (Am. Law Inst. 1977)). As to misrepresentations, the fraud statutes generally "extend[] to 'everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future.'" *Pasquantino v. United States*, 544 U.S. 349, 377 (2005) (quoting *Durland v. United States*, 161 U.S. 306, 313 (1896)).

Furthermore, "fraudulent concealment—without any misrepresentation or duty to disclose—can constitute common-law fraud." *Colton*, 231 F.3d at 899. "Although silence as to a material fact (nondisclosure), without an independent disclosure duty, usually does not give rise to an action for fraud, suppression of the truth with the intent to deceive (concealment) does." *Id.* (citation omitted); *see also United States v. Gray*, 40 F.3d 227, 235–36 (4th Cir. 2005) ("Although simple nondisclosure generally is not sufficient to constitute fraud, . . . 'mere silence is quite different from concealment,' and in some cases 'a suppression of the truth may amount to a suggestion of falsehood.'" (quoting *Stewart v. Wyoming Cattle Ranche Co.*, 128 U.S. 383, 388 (1888)). "Given th[e] 'close relationship' between nondisclosure and concealment, numerous [courts] expressly distinguish between passive concealment—mere nondisclosure or silence—and active concealment, which involves the requisite intent to mislead by creating a false impression or representation, and which is sufficient to constitute fraud even without a duty to speak." *Colton*, 231 F.3d at 899 (alterations omitted). To demonstrate the requisite active concealment to constitute fraud, "the Government [is] required to present evidence establishing that [the

14

defendant] took 'active or elaborate steps to conceal information' from [the victim]." *United States v. Nichols*, 15 F. App'x 80, 83 (4th Cir. 2001) (quoting *Colton*, 231 F.3d at 901).   In summary, "[t]he gist of [fraud] is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant, or his concealment or suppression of material facts not equally within the knowledge or reach of the [victim]."   *Colton*, 231 F.3d at 899 (quoting *Stewart v. Wyo. Cattle Ranche Co.*, 128 U.S. 383, 388 (1888)).

There is no indication in the record that Defendant provided an affirmative misrepresentation to his employer regarding the Scheme.   As such, the misrepresentation approach to establishing the existence of a fraud is inapplicable in this matter.

The record does establish, however, that Defendant participated in a scheme to defraud Mingo Logan under both failure-to-disclose and concealment theories.   Under the former theory, Defendant was employed by Mingo Logan as a purchasing manager.   (ECF No. 5, Ex. B at 1.) In this position—and as discussed at length below—Defendant had a duty to inform Mingo Logan that he directed work to a third party vendor in exchange for kickback payments.   Defendant failed to disclose this information to his employer and this silence constituted a fraudulent scheme.   *See, e.g.*, *Mandel*, 591 F.2d at 1363.

The record also reflects that Defendant took active steps to conceal his kickback arrangement with CM Supply.   In particular, Defendant received the kickback payments from Roeher "at locations away from Mountain Laurel to avoid the detection of" the Scheme.   (ECF No. 5, Ex. B at 2.)   Defendant's acts of meeting with Roeher at locations other than Defendant's place of employment for the purpose of receiving kickbacks and avoiding the detection of the

Scheme by his employer constitute affirmative acts to conceal the Scheme. *See, e.g.*, *Colton*, 231 F.3d at 901 ("What is essential is proof of a 'scheme or artifice to defraud,' which can be shown by deceptive acts or contrivance intended to hide information, mislead, avoid suspicion, or avert further inquiry into a material matter."). These acts therefore constitute fraud under the concealment approach to fraud. *See, e.g.*, *Nichols*, 15 F. App'x at 83.

Based on the foregoing, the Court finds that the Scheme constituted a scheme to defraud, thereby satisfying the first element of an honest-services mail fraud offense.

## B.      Bribes or Kickbacks

The next element of an honest-services mail fraud offense is the first requirement applicable specifically to an honest-services theory of criminal liability—the fraudulent scheme must involve bribery or kickbacks. *See Skilling v. United States*, 561 U.S. 358, 404 (2010). In *Skilling*, the Supreme Court addressed the defendant's argument that "[t]he honest-services statute, § 1346, . . . is unconstitutionally vague." *Id.* at 399. The *Skilling* Court looked to the traditional "core" of honest-services offenses and ultimately restricted honest-services fraud to "*only* the bribe-and-kickback core of the pre-*McNally* case law." *Id.* at 409 (2010) (emphasis in original); *cf. United States v. Bryan*, 58 F.3d 933, 940 n.1 (4th Cir. 1995) ("That Congress enacted section 1346 so soon after *McNally* strongly suggests that section 1346 was intended as precisely the sort of 'clear indication' that Congress was content with the [pre-*McNally*] interpretations of the mail fraud statute . . . ."), *abrogated in part on other grounds by United States v. O'Hagan*, 521 U.S. 642 (1997). Stated differently, viable honest-services fraud cases "involve[] fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." *Skilling*, 561 U.S. at 404; *see also United States v. McDonnell*, 792 F.3d

16

478, 504–05 (4th Cir. 2015) ("The Supreme Court has recognized that § 1346 proscribes two, and only two, types of activities: bribery and kickback schemes." (citing *Skilling*, 561 U.S. 358)), *vacated on other grounds*, 136 S. Ct. 2355 (2016); *United States v. Jefferson*, 674 F.3d 332, 360 (4th Cir. 2012) ("The *Skilling* decision limited the scope of the honest services . . . fraud statute, found in 18 U.S.C. § 1346, by confining its application to bribes and kickbacks only."). *See generally United States v. DeMizio*, 741 F.3d 373, 382 (2d Cir. 2014) (noting that the *Skilling* Court "analyzed cases involving public officials as well as cases involving employees in the private sector in deciding the appeal brought by Skilling himself, a private-sector employee" (alteration and citation omitted)). The *Skilling* Court stated that its "construction of § 1346 establishes a uniform national standard, defines honest services with clarity, reaches only seriously culpable conduct, and accomplishes Congress's goal of overruling *McNally*." *Id.* at 411 (alterations omitted) (citation omitted). The Court further noted that "[r]eading [Section 1346] to proscribe a wider range of offensive conduct . . . would raise the due process concerns underlying the vagueness doctrine." *Skilling*, 561 U.S. at 408.

As to what constitutes a kickback in the context of Section 1346, the *Skilling* Court stated that this statute's "prohibition on . . . kickbacks draws content not only from the pre-*McNally* case law, but also from federal statutes proscribing—and defining—similar crimes." *Id.* at 412; *cf. McDonnell*, 136 S. Ct. at 1367–75 (discussing honest-services wire fraud and looking to the federal bribery statute, 18 U.S.C. § 201). Title 41, Section 8701 of the United States Code—which the Supreme Court cited with approval in *Skilling* as providing useful guidance on the definition of a "kickback," *see* 561 U.S. at 412—addresses public contracts and provides the following definition of a "kickback":

> The term "kickback" means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind that is provided to a . . . [party to a contract] . . . to improperly obtain or reward favorable treatment in connection with a . . . contract.

41 U.S.C. § 8701(2) (formerly 41 U.S.C. § 52(2)).   In *United States v. DeMizio*, the Second Circuit similarly described a "kickback" scheme for purposes of Section 1346 as "typically involv[ing] an employee's steering business of his employer to a third party in exchange for a share of the third party's profits on that business." 741 F.3d at 381 (citation omitted); *see also Kickback*, Black's Law Dictionary (10th ed. 2014) (defining the term "kickback" as "[a] sum of money illegally paid to someone in authority, esp. for arranging for a company to receive a lucrative contract; esp., a return of a portion of a monetary sum received, usu. as a result of coercion or a secret arrangement").

The Court finds that the requirement that the fraudulent scheme involve bribery or kickbacks is satisfied in the instant matter.   Defendant was employed as a purchasing agent at Mountain Laurel and, between 2009 and 2014, he used this position to direct his employer's purchases of crib blocks to CM Supply in exchange for monetary payments.   (ECF No. 5, Ex. B at 1 ("[Defendant], as purchasing agent, provided favorable official action to . . . Roeher and [CM Supply] by selecting [CM Supply] to provide crib blocks at Mountain Laurel . . . in exchange for . . . kickbacks.").)   This is a classic kickback scheme involving an employee providing favorable official action to a third party in exchange for monetary compensation.   *See, e.g.*, *DeMizio*, 741 F.3d at 381 (describing a "kickback" scheme for purposes of an honest-services offense).   Accordingly, the Court finds that the bribery-or-kickback requirement of an honest-services mail fraud offense is satisfied here.

18

C.    **Fiduciary Duty**

The next element of an honest-services mail fraud offense is an additional requirement specific to the honest-services doctrine—a fiduciary duty.  This Court recently addressed the fiduciary duty requirement of an honest-services offense in a case related to the instant matter and found that the "the Supreme Court's decision in *Skilling* imposes a requirement in private-sector honest services fraud cases that an employee must have a fiduciary duty to a private-sector entity that was deprived of that employee's honest services."   *United States v. Evans*, Criminal Action No. 2:14–cr–00113, 2015 WL 1808904, at *4 (S.D. W. Va. Apr. 21, 2015) (citation omitted); *see, e.g.*, *United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016) (noting that "a violation of a fiduciary duty" is an "element of honest-services fraud," which the *Skilling* Court "mentioned in passing" (citing *Skilling v. United States*, 561 U.S. 358, 407 (2010))); *United States v. Nayak*, 769 F.3d 978, 980 (7th Cir. 2014) (noting that the *Skilling* decision "also held that 'the violation of a fiduciary duty' was a prerequisite to an honest-services fraud conviction" (citing *Skilling*, 561 U.S. at 407–08)); *United States v. Nouri*, 711 F.3d 129, 137 n.1 (2d Cir. 2013) ("The 'existence of a fiduciary relationship' between an employee and employer is 'beyond dispute,' and the violation of that duty through the employee's participation in a bribery or kickback scheme is within the core of actions criminalized by § 1346." (citing *Skilling*, 561 U.S. at 406–07 & n.1)); *United States v. Milovanovic*, 678 F.3d 713, 722 (9th Cir. 2012) ("A close examination of the Supreme Court's opinion in *Skilling* reveals that embedded in the Court's holding . . . is the implication that a breach of fiduciary duty is an element of honest services fraud." (citing *Skilling*, 561 U.S. at 408–09)); *Kovach v. Access Midstream Partners, L.P.*, CASE NO. 5:15-cv-616, 2016 WL 1162061, at *10 n.6 (N.D. Ohio Mar. 23, 2016) ("In the wake of *Skilling*, this court, like many others, has held that

19

honest services fraud requires a fiduciary relationship." (citations omitted)); *United States v. Scanlon*, 753 F. Supp. 2d 23, 25 (D.D.C. 2010) ("*Skilling* made clear . . . that bribery and kickback schemes under § 1346 must involve a breach of fiduciary duty, as this duty establishes the right to one's honest services out of which the victim of § 1346 is defrauded."); *cf. United States v. Vinyard*, 266 F.3d 320, 327–28 (4th Cir. 2001) (analyzing the honest-services doctrine in a pre-*Skilling* opinion and adopting the "reasonably foreseeable harm" test, which includes the requirements that "the Government must prove that the employee" defendant of a private-sector entity "intended to breach a fiduciary duty, and that the employee foresaw or reasonably should have foreseen that his employer might suffer an economic harm as a result of the breach" (citation omitted)).   *But see id.* at 327 n.5 (noting that, in pre-*Skilling* decisions, "[t]he Second and Eighth Circuits . . . held that an employee does not need to breach a fiduciary duty to his employer to violate § 1346" (citing *United States v. Ervasti*, 201 F.3d 1029, 1036 (8th Cir. 2000) and *United States v. Sancho*, 157 F.3d 918, 920 (2d Cir. 1998))).

The fiduciary duty requirement implicates a troubling analysis that has divided federal courts throughout the country.   This analysis implicates three discrete questions: (1) what types of relationships potentially give rise to the requisite fiduciary duty?; (2) what are the permissible legal sources of the fiduciary duty?; and (3) what is the nature or scope of the fiduciary duty, such that a defendant's breach of this obligation would satisfy the fiduciary duty requirement of honest services fraud?   *See, e.g.*, *United States v. Smith*, 985 F. Supp. 2d 547, 591–606 (S.D.N.Y. 2014) (addressing the defendant's vagueness as-applied challenge to an honest-services offense and discussing the relationships, legal sources, and scope of fiduciary duties that satisfy the fiduciary duty requirement).   *See generally SEC v. Chenery Corp.*, 318 U.S. 80, 85–86 (1943) ("But to say

20

that a man is a fiduciary only begins [the] analysis; it gives direction to further inquiry.   To whom is he a fiduciary?   What obligations does he owe as a fiduciary?   In what respect has he failed to discharge these obligations?").   Anticipating the first question, the Supreme Court noted the following in a footnote in *Skilling*:

> The existence of a fiduciary relationship, under any definition of that term, was usually beyond dispute; examples include public official-public, *see, e.g.*, *United States v. Mandel*, 591 F.2d 1347 (C.A.4 1979); employee-employer, *see, e.g.*, *United States v. Bohonus*, 628 F.2d 1167 (C.A.9 1980); and union official-union members, *see, e.g.*, *United States v. Price*, 788 F.2d 234 (C.A.4 1986).   *See generally Chiarella v. United States*, 445 U.S. 222, 233, 100 S. Ct. 1108, 63 L.Ed.2d 348 (1980) (noting the "established doctrine that [a fiduciary] duty arises from a specific relationship between two parties").

561 U.S. at 407 n.41 (alteration in original); *see also Scanlon*, 753 F. Supp. 2d at 25 (stating that "even if . . . the majority of pre-*McNally* bribery or kickback cases involved one of the[] three relationships" identified in footnote 41 of the *Skilling* decision, "this does not mean that these examples represent an exhaustive list of the fiduciary relationships that can support an honest-services fraud prosecution, to the exclusion of other fiduciary relationships such as attorney-client, doctor-patient, or stockbroker-customer").   "As such, a 'specific relationship,' such as 'employee-employer,' satisfies the fiduciary duty requirement."   *Evans*, 2015 WL 1808904, at *4 (quoting *Skilling*, 561 U.S. at 407 n.41).   *But see Milovanovic*, 678 F.3d at 724 (holding "that a fiduciary duty for the purposes of [Section 1341] is not limited to a formal 'fiduciary' relationship well-known in the law" and instead "also extends to a trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise" (citation omitted)).   *See generally Scanlon*, 753 F. Supp. 2d at 27 (noting that "[t]he existence of a fiduciary duty depends on the relationship between the parties" (citation omitted)).

21

In the instant case, Defendant held an employee-employer relationship with the allegedly defrauded private-sector entity—Mingo Logan.   (*See, e.g.*, ECF No. 5, Ex. B at 1.)   This relationship was specifically identified by the Supreme Court as constituting the type of relationship that could sustain an honest-services offense.   *See Skilling*, 561 U.S. at 407 n.41 (citation omitted).   The Court therefore finds that Defendant held a relationship with Mingo Logan that potentially could give rise to the requisite fiduciary duty.

The Court must next determine the source of Defendant's potential fiduciary duty to his employer.   *See, e.g.*, *Evans*, 2015 WL 1808904, at *4 ("In order to determine whether [a defendant] held [the requisite fiduciary] duty, the Court must address the source and scope of fiduciary duties that satisfy the fiduciary duty requirement of honest services fraud.").   This analysis is substantially muddled by the fact that "the term 'fiduciary duty' has different meanings in different contexts" and a person "conceivably could have owed a fiduciary duty to . . . entities and individuals under federal but not state law, or under state law but not federal; under general trust but not agency law, or under agency law but not general trust."   *Smith*, 985 F. Supp. 2d at 592 (citation omitted).

The Court is unable to locate any case law from the Fourth Circuit or other courts in this District that specifically delineates the permissible sources or scope of fiduciary duties that can sustain an honest-services offense in the private sector. [4]   However, numerous courts have addressed this issue—directly or indirectly—and reached wildly different determinations as to the

---

[4] In *United States v. Bryan*, the Fourth Circuit stated that "the fact that a scheme to defraud may or may not violate state law does not determine whether the scheme is within the proscription of the mail fraud statute."   58 F.3d 933, 940 (4th Cir. 1995) (citation omitted), *abrogated in part on other grounds by United States v. O'Hagan*, 521 U.S. 642 (1997).   While the *Bryan* court indicated that the mail-fraud statute does not require a predicate violation of state law, it did not otherwise note whether state law regarding fiduciary duties is a permissible source of fiduciary obligations that can sustain an honest-services offense.   *See id.* at 939–43.

permissible sources of fiduciary duties that can sustain an honest-services offense, *see, e.g.*, *Smith*, 985 F. Supp. 2d at 597 ("[C]ourts have looked to a smorgasbord of sources to find the fiduciary duty that, after *Skilling*, presumably underpins all honest-services-fraud prosecutions."), such as (1) federal law, *see, e.g.*, *United States v. deVegter*, 198 F.3d 1324, 1329 (11th Cir. 1999) ("The nature and interpretation of the [fiduciary] duty is a question of federal law."); *United States v. Frost*, 125 F.3d 346, 366 (6th Cir. 1997) ("Federal law governs the existence of fiduciary duty under the mail fraud statute." (citation omitted)); *cf. United States v. Weyhrauch*, 548 F.3d 1237, 1244 (9th Cir. 2008) ("The majority of circuits . . . have held that the meaning of 'honest services' is governed by a uniform federal standard inherent in § 1346, although they have not uniformly defined the contours of that standard." (citations omitted)), *vacated on other grounds*, 561 U.S. 476 (2010); (2) state law, *see, e.g.*, *United States v. Urciuoli*, 513 F.3d 290, 298 (1st Cir. 2008) ("Conceivably in some circumstances, state law might bear on what 'services' are owed . . . . But just how far state law might be a premise for honest services fraud . . . [is a] tricky question[] and may depend *inter alia* on precisely what the government has charged." (citation omitted)); *United States v. Murphy*, 323 F.3d 102, 116 & n.5 (3d Cir. 2003) ("endors[ing] . . . a state law limiting principle for honest services fraud" that "state law must provide the specific honest services owed by the defendant in a fiduciary relationship" (citation omitted)); *United States v. Brumley*, 116 F.3d 728, 734 (5th Cir. 1997) ("[Section 1346] contemplates that there must first be a breach of a state-owed duty."); (3) common law, *see, e.g.*, *Milovanovic*, 678 F.3d at 724–25 (considering common law relating to agency when determining which "formal" and "informal" fiduciary relationships satisfy the fiduciary duty requirement of honest-services fraud); (4) inherent duties arising out of a defendant's position, *see, e.g.*, *United States v. Barber*, 668 F.2d 778, 784 n.4 (4th

23

Cir. 1982) (noting that the defendant, "an official of the West Virginia Alcoholic Beverage Control Commission," breached "the fiduciary duty [the defendant] owed to the state and its citizens" for purposes of an honest-services mail fraud offense); *United States v. Mandel*, 591 F.2d 1347, 1363 (4th Cir.) ("[T]he Governor of the State of Maryland is trustee for the citizens and the State of Maryland and thus owes the normal fiduciary duties of a trustee, e.g., honesty and loyalty." (citation omitted)), *overruled on other grounds by* 602 F.2d 653 (4th Cir. 1979); *United States v. Lemire*, 720 F.2d 1327, 1335–36 (D.C. Cir. 1983) ("The duty breached need not arise from state or federal law; in particular, it may stem from an employment relationship of the sort that imposes discretion and consequently obligations of loyalty and fidelity on the employee."); *United States v. Ballard*, 663 F.2d 534, 541 (5th Cir. 1981) (noting that an "an employee's" obligation to provide their employer with "faithful and honest services" includes "the duty to disclose, which may be imposed by state or federal statute or may arise from the employment relationship itself"); and (5) contractual agreements to which the defendant is a party, *see, e.g.*, *United States v. Sorich*, 523 F.3d 702, 712 (7th Cir. 2008) (declining to find that "only state law can supply a fiduciary duty between public official and public or between employee and employer in honest services cases" and noting that "other sources," such as employee handbooks and power of attorney agreements, "can create a fiduciary obligation" (citing *United States v. George*, 477 F.2d 508, 514 n.7 (7th Cir. 1973) and *United States v. Williams*, 441 F.3d 716, 723–24 (9th Cir. 2006))). *See generally United States v. Smith*, 985 F. Supp. 2d 547, 598 (S.D.N.Y. 2014) ("The circuits appear to be split into three camps: those that permit the fiduciary duty to be derived from various sources, including state, federal, and common law; those that require the fiduciary duty to be derived from state law; and those that require the fiduciary duty to be derived from federal law.").

24

While the Court recognizes that the issue of the permissible sources of fiduciary duties that can sustain honest-services offenses is not resolved in this Circuit or District, the Court finds that it need not take a specific position on this issue in the present case.   Regardless of which source of fiduciary duties is considered, the scope of Defendant's fiduciary obligations to his employer clearly encompass the present kickback Scheme.   *Cf. United States v. Halloran*, 821 F.3d 321, 338 (2d Cir. 2016) (rejecting the defendant's argument that the honest-services statute was unconstitutionally vague as-applied due to purported uncertainties regarding the permissible sources of fiduciary duties because, "[i]n all respects relevant to the . . . conduct, there is no meaningful difference between the federal and New York law standards for determining whether a fiduciary duty exists").

In particular, as Mingo Logan's employee, Defendant held fiduciary obligations to abstain from taking kickbacks, or—if he received kickbacks—to disclose this pertinent information to his employer.   However, Defendant utilized his employment-related authority to direct purchasing orders to an outside vendor in exchange for kickbacks without notifying his employer of this arrangement.   (*See* ECF No. 5, Ex. B.)   This conduct undoubtedly breached fiduciary obligations Defendant held under each of the potential sources of fiduciary duties, including (1) federal law, *see, e.g.*, *United States v. deVegter*, 198 F.3d 1324, 1329–30, n.5 (11th Cir. 1999) ("'The prosecution must prove that the employee intended to breach a fiduciary duty' . . . The nature and interpretation of the duty owed is a question of federal law," then discussing cases finding that undisclosed kickbacks breach fiduciary duties.); (2) West Virginia state law, *see, e.g.*, *Lucas v. United Fabricating, Inc.*, Civil Action No. 5:06CV154 (STAMP), 2007 WL 2477347, at *4 (N.D. W. Va. Aug. 29, 2007) ("[A]n employee is prohibited from using an employer's property for

personal advantage and from deriving secret profits by virtue of the employment relationship." (citing *Gaston v. Wolfe*, 53 S.E.2d 632 (W. Va. 1949))); (3) common law, *see, e.g.*, *id.* ("It is a general principle of agency that an agent or employee is bound to exercise the utmost good faith, loyalty, and honesty toward his or her principle or employer." (citing 3 Am. Jur. 2d *Agency* § 205)); or (4) duties that were inherent in Defendant's employment position, *see, e.g.*, *Lemire*, 720 F.2d 1327 at 1335–36 ("The duty breached . . . may stem from an employment relationship of the sort that imposes discretion and consequently obligations of loyalty and fidelity on the employee."). Furthermore, Defendant's use of his employment position to execute the kickback Scheme falls within the heartland of honest-services offenses identified by the Supreme Court. *See, e.g.*, *United States v. Nouri*, 711 F.3d 129, 137 n.1 (2d Cir. 2013) ("The 'existence of a fiduciary relationship' between an employee and employer is 'beyond dispute,' and the violation of that duty through the employee's participation in a bribery or kickback scheme is within the core of actions criminalized by § 1346." (citing *Skilling v. United States*, 561 U.S. 358, 406–09 & n.41 (2010))).

For these reasons, the Court finds that Defendant held the type of relationship with his employer that can sustain an honest-services offense and that the scope of his fiduciary duties to Mingo Logan are sufficient to sustain this offense—regardless of the potential sources of these fiduciary obligations. The Court therefore also finds that the fiduciary duty requirement of an honest-services offense is satisfied in this matter.

## D.     Reasonably Foreseeable Harm Test

The next two elements are both parts of the same test that applies to the situation (and Circuit) presented in this case—namely, an honest-services theory of criminal liability in the

private-sector context.   In this situation, the Fourth Circuit has followed the so-called "reasonably

foreseeable harm" test.[5]   *See United States v. Vinyard*, 266 F.3d 320, 327–29 (4th Cir. 2001).

Under this test, the Government must prove the following two elements in the specific context

where the defendant is an employee of the harmed entity: (1) "that the employee intended to breach

---

[5] The courts of appeals are "split over the proper approach" in the context of "the honest services doctrine in the private employment context." *United States v. Vinyard*, 266 F.3d 320, 327 (4th Cir. 2001).  Some circuits follow the reasonably foreseeable harm test, which, as discussed at length herein, provides that the Government "must prove that the employee intended to breach a fiduciary duty, and that the employee foresaw or reasonably should have foreseen that his employer might suffer an economic harm as a result of the breach." *Id.* (quoting *United States v. Frost*, 125 F.3d 346, 368 (6th Cir. 1997)).  Other circuits follow the materiality test, which "require[s] a showing that the employee possessed a fraudulent intent and that the misrepresentation at issue was material." *Id.* (citing *United States v. Cochran*, 109 F.3d 660, 667 (10th Cir. 1997)).  In *Vinyard*, the Fourth Circuit elected to adopt the reasonably foreseeable harm test "because it both keeps the focus on employee intent and because it limits the scope of § 1346 to serious harms." *Id.* at 328–29.

In its briefing, the Government argues that the two-part reasonably foreseeable harm test did not survive as additional requirements for honest-services offenses following the Supreme Court's decision in *Skilling v. United States*, 561 U.S. 358, 399 (2010).  (ECF No. 4, Ex. 1 at 4 n.2.)  In support of this assertion, the Government notes that the Fourth Circuit and the Fifth Circuit did not address the reasonably foreseeable harm or materiality tests in two post-*Skilling* honest-services cases.  (*See* ECF No. 12 at 1–2 (citing *United States v. McDonnell*, 792 F.3d 478 (4th Cir. 2015), *vacated on other grounds*, 136 S. Ct. 2355 (2016) and *United States v. Nagin*, 810 F.3d 348 (5th Cir. 2016)).)

The Court is not persuaded by the Government's argument.  As the Government notes, the *Skilling* Court did not address the circuit split regarding the reasonably foreseeable harm or materiality tests.  *See* 561 U.S. 358.  However, the absence of such a discussion does not mean, as the Government asserts, that the Supreme Court "supplant[ed]" the reasonably foreseeable harm test.  (ECF No. 12 at 1.)  To the contrary, the *Skilling* Court addressed an entirely different requirement under the honest-services doctrine—namely, the types of schemes (bribery or kickback) that survive a vagueness challenge and may sustain an honest-services charge.  *See* 561 U.S. at 399–413.  Thus, absent some further indication to the contrary from the Supreme Court or the Fourth Circuit, the Court shall follow the clear precedent from the Fourth Circuit in *Vinyard* and apply the reasonably foreseeable harm test in the context of the instant alleged private-sector honest-services offense.

The Court does concur with the Government that the Fourth Circuit and the Fifth Circuit did not address the reasonably foreseeable harm or materiality tests in either *McDonnell* or *Nagin*.  However, that is of no import, as those cases both addressed honest-services theories in the *public*-sector context, *see McDonnell*, 792 F.3d at 504–20; *Nagin*, 810 F.3d at 350–52, which has its own separate and distinct requirements, *see, e.g.*, *McDonnell v. United States*, 136 S. Ct. 2355, 2367–75 (2016) (discussing the "official act" requirement of a public-sector honest-services offense).  Conversely, a *private*-sector honest-service offense—one type of which is the subject of the instant case—requires, in part and in this Circuit, that the Government establish the elements under the reasonably foreseeable harm test.  *See Vinyard*, 266 F.3d at 328–29.

The Court certainly empathizes with the Government's position that it would be desirable to simplify the elements for honest-services offenses.  The slow and unsteady evolution of the honest-services doctrine has resulted in what can generously be characterized as an extensive and unwieldy set of elements for these offenses.  The Court would welcome further case law from the Supreme Court or the Fourth Circuit either simplifying and streamlining the requirements for honest-services offenses, or reassessing the constitutional validity of the honest-services doctrine. Nonetheless, in the meantime, the Court shall apply the varied elements of the instant private-sector honest-services offense, as provided by applicable precedent.

a fiduciary duty;" and (2) "that the employee foresaw or reasonably should have foreseen that his employer might suffer an economic harm as a result of the breach."[6]  *Id.* at 327 (quoting *Frost*, 125 F.3d at 368).

      1.    <u>Intent to Breach Fiduciary Duty</u>

Turning first to the intent requirement under the reasonably foreseeable harm test—*i.e.*, "that the employee intended to breach a fiduciary duty," *id.*—the Court finds that there is sufficient evidence in the record to infer that Defendant held the requisite intent to violate his fiduciary duty to Mingo Logan.  *Cf. United States v. Diamond*, 788 F.2d 1025, 1030 (4th Cir. 1986) (stating that "direct evidence" of the requisite *mens rea* "is of course seldom possible and never a requisite to finding the necessary culpability of mind beyond a reasonable doubt"); *United States v. DiZenzo*, 500 F.2d 263, 265 (4th Cir. 1974) ("[C]riminal intent may be inferred from subsequent as well as prior acts."); *United States v. Williams*, 478 F.2d 369, 373 (4th Cir. 1973) ("It is true that criminal intent must be inferred from the facts and circumstances of the case." (citation omitted)). Defendant stated that, "[i]n his position as purchasing manager, [he] acted as an agent of Mingo Logan . . . , and had a fiduciary duty to the company."   (ECF No. 7 ¶ 3(b).)   Additionally, during the January 19, 2016 hearing in this case, Defendant acknowledged that he "understood" that his duties to his employer included (1) receiving "the best deal on the crib blocks as the purchasing agent for his employer;" (2) refraining from "tak[ing] kickbacks;" and (3) "if he was taking

---

[6] In its briefing, the Government asserts that, "even in those cases employing the 'reasonable foreseeability' test, the question of the defendant's intent to breach the duty is not separately analyzed."   (ECF No. 8 at 4.)   However, contrary to this assertion, the Fourth Circuit separately analyzed the *mens rea* and foreseeable harm components of the reasonably foreseeable harm test in *United States v. Vinyard*, *see* 266 F.3d 320, 329–30 (4th Cir. 2001)—the case that established these requirements in this Circuit, *see id.* at 327–29.   The Court therefore declines the Government's invitation to conflate the two requirements of the reasonably foreseeable harm test and, instead, shall follow the guidance of the Fourth Circuit from *Vinyard* and separately analyze the intent and foreseeable risk of economic harm components of this test.

kickbacks, that would be information that his employer would want to know and that he had a duty to disclose" that information.   (ECF No. 11 at 16–17.)   Finally, Defendant stated that he "knowingly failed to apprise [Mingo Logan] of" the "portion of the proceeds from the sale of the crib blocks" that Defendant received through his participation in the Scheme.   (ECF No. 7 ¶ 3(d).) The Court finds that Defendant's recognition of his fiduciary position and its attendant responsibilities and his knowing failure to disclose the kickbacks to his employer constitute sufficient evidence from which the Court may infer that Defendant intentionally violated his fiduciary duty to Mingo Logan.   *See, e.g.*, *Oxygene v. Lynch*, 813 F.3d 541, 549 (4th Cir. 2016) ("[I]t is ordinarily reasonable to infer that a person intends the natural and probable consequences of acts knowingly done or undertaken." (quoting *United States v. Neiswender*, 590 F.2d 1269, 1274 (4th Cir. 1979))); *cf. Lucas v. United Fabricating, Inc.*, Civil Action No. 5:06CV154 (STAMP), 2007 WL 2477347, at *4 (N.D. W. Va. Aug. 29, 2007) (discussing an employee's fiduciary duties to their employer and stating that "an employee is prohibited from using an employer's property for personal advantage and from deriving secret profits by virtue of the employment relationship" (citing *Gaston v. Wolfe*, 53 S.E.2d 632 (W. Va. 1949))).

Furthermore, the record also includes evidence that Defendant took affirmative actions to conceal his participation in the Scheme from Mingo Logan.   Specifically, Defendant stipulated that he "concealed and covered up his participation in the [S]cheme from Mingo Logan," such as by "receiv[ing] the cash kickbacks from . . . Roeher at locations away from Mountain Laurel to avoid . . . detection."   (ECF No. 5, Ex. B at 2.)   The Court finds that Defendant's affirmative acts to conceal the Scheme from his employer constitute additional evidence supporting the inference that Defendant intended to breach his fiduciary duty to Mingo Logan.   *See, e.g.*, *United States v.*

*McDonnell*, 792 F.3d 478, 501 (4th Cir. 2015) ("[A]n attempt to conceal actions may indicate an individual has a guilty conscience or is aware of the unlawfulness of the actions." (citing *United States v. Zayyad*, 741 F.3d 452, 463 (4th Cir. 2014))), *vacated on other grounds*, 136 S. Ct. 2355 (2016). *See generally Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required." (citation omitted)).

For these reasons, the Court finds that the Government has proven that Defendant intended to breach a fiduciary duty he owed to Mingo Logan. The Court next proceeds to the second requirement under the reasonably foreseeable harm test.

2.     Reasonably Foreseeable Risk of Economic Harm

The second requirement under the Fourth Circuit's iteration of the reasonably foreseeable harm test requires the Government to prove "that the employee foresaw or reasonably should have foreseen that his employer might suffer an economic harm as a result of the breach." *United States v. Vinyard*, 266 F.3d 320, 327 (4th Cir. 2001) (quoting *United States v. Frost*, 125 F.3d 346, 368 (6th Cir. 1997)). The Fourth Circuit provided the following pertinent discussion regarding this requirement:

> The reasonably foreseeable harm test neither requires an actual economic loss nor an intent to economically harm the employer. Under this test, the employee need only intend to breach his fiduciary duty and reasonably foresee that the breach would create an identifiable economic risk for the employer. Thus, the reasonably foreseeable harm test is met whenever, at the time of the fraud scheme, the employee could foresee that the scheme potentially might be detrimental to the employer's economic well-being. Furthermore, the concept of "economic risk" embraces the idea of risk to future opportunities for savings or profit; the focus on the employer's well-being encompasses both the long-term and the short-term health of the business. Whether the risk materializes or not is irrelevant; the point is that the employee has no right to endanger the employer's financial health or jeopardize the employer's long-term prospects through self-dealing. Therefore, so

30

long as the employee could have reasonably foreseen the risk to which he was exposing the employer, the requirements of § 1346 will have been met.

*Id.* at 329 (citations omitted). *See generally Frost*, 125 F.3d at 369 ("We do not believe that this standard imposes an especially rigorous evidentiary burden upon the prosecution."). Nonetheless, "[p]roof that the employer simply suffered only the loss of the loyalty and fidelity of the defendant is insufficient to convict." *Frost*, 125 F.3d at 368 (citation omitted); *see also United States v. Lemire*, 720 F.2d 1327, 1336 (D.C. Cir. 1983) ("Employee loyalty is not an end in itself, it is a means to obtain and preserve pecuniary benefits for the employer. An employee's undisclosed conflict of interest does not by itself necessarily pose the threat of economic harm to the employer.").

The Court finds that the second component of the reasonably foreseeable harm test is satisfied in this case because it was reasonably foreseeable to Defendant that his involvement in the Scheme would result in Mingo Logan receiving a suboptimal service from CM Supply. At the time Defendant initially allocated work to CM Supply after the initiation of the Scheme, Defendant had a conflict of interest that reasonably could have caused Defendant to select CM Supply over a different third-party vendor that would provide a better service to Mingo Logan. *Cf. United States v. deVegter*, 198 F.3d 1324, 1331 (11th Cir. 1999) ("[T]he purpose of [the employer's] employment of [the employee] was to obtain an independent recommendation about the best . . . proposals submitted. Corrupting the process by which this recommendation was made poses a reasonably foreseeable risk of economic harm to [the employer] because the best underwriter might not be recommended."). Additionally, Defendant's conflict of interest also reasonably could have resulted in him ignoring deficiencies in CM Supply's performance anytime during the conjoined life of the Scheme and CM Supply's service to Mingo Logan. Simply put,

31

absent the Scheme, Defendant was free to put the interests of his employer first; with the Scheme, Defendant held an interest that reasonably could have resulted in him turning a blind eye to CM Supply providing a suboptimal service to Defendant's employer.   As such, the Court finds that the second requirement of the reasonably foreseeable economic harm test is satisfied under the theory that Defendant reasonably should have foreseen that Mingo Logan might receive a suboptimal service from CM Supply due to Defendant's involvement in the Scheme.[7]   *See United*

---

[7] The Government argues that it was also reasonably foreseeable that Defendant's involvement in the Scheme would result in an economic harm to his employer due to the risk that Mingo Logan would receive a suboptimal price for the work Defendant allocated to CM Supply.  (*See, e.g.*, ECF No. 8 at 9.)   As the Government notes, the second requirement of the reasonably foreseeable harm test may be satisfied by evidence that a defendant should have reasonably foreseen that their participation in a fraudulent scheme would result in their employer receiving a suboptimal price.  *See, e.g.*, *United States v. Vinyard*, 266 F.3d 320, 330 (4th Cir. 2001) (finding that a fraudulent scheme "exposed [the employer] to a reasonably foreseeable economic risk" where it "create[d] a clear risk that the employer [would] receive, in terms of *price* and quality of work, suboptimal service" (citation omitted)); *see also United States v. Pennington*, 168 F.3d 1060, 1065 (8th Cir. 1999) (applying a variation of the reasonably foreseeable harm test that requires actual harm or injury to the employer and finding that the standard was satisfied where "a reasonable jury could find that the scheme was intended to and did defraud [the employer] by depriving it of [the employee's] honest services in obtaining the most advantageous supply, brokerage, and consulting contracts that could be negotiated" with third parties); *cf. United States v. Fagan*, 821 F.2d 1002, 1009 (5th Cir. 1987) ("Quite simply, if [the employee] had not violated his duty to disclose, [the employer] might have captured for itself the large sums that [the employee] was secreting because [the employer] would have known that [the third party] was willing to lease his boats for less. This possibility clearly had some value."); *United States v. George*, 477 F.2d 508, 513 (7th Cir. 1973) (noting that "[t]here was a very real and tangible harm to [the employer] in losing the discount or losing the opportunity to bargain with a most relevant fact before it" where the employee "secretly earn[ed] a profit from his agency" and "deprived [the employer] of material knowledge that [the third party] would accept less profit").

Nonetheless, the Court finds that the record is insufficient to determine whether this requirement is met in this case under a suboptimal-price theory.  The Government submitted checks that show that Arch Coal made three separate payments from one of its accounts to CM Supply in July 2009.  (*See* ECF No. 12, Exs. 1–3.)   The Government also represented that "an assistant controller for Arch Coal" explained that Arch Coal directly made payments to CM Supply from a "concentrated" account—which it uses to pay for costs related to its subsidiaries—throughout "the life of the [S]cheme."   (ECF No. 12 at 3 & n.2.)   This Arch Coal employee further explained that the "entries" for all of these payments "were . . . immediately transferred to the corporate books of Mingo Logan."   (*Id.* at 3.)

However, these representations do not answer the ultimate question in this analysis—namely, did the transfer of the "entries" for these payments actually create a reasonably foreseeable economic risk to Defendant's employer? Based on this evidence, it is unclear whether Mingo Logan could have suffered any form of economic harm based on Arch Coal paying more to CM Supply due to the Scheme, or if those inflated payments were actually borne by Mingo Logan through the transfer of accounts.  For example, these transfers may have been a part of an accounting process whereby Mingo Logan could offset other payments or expenditures and not actually result in any potential for economic detriment.  Given this meager record, the Court cannot make the separate determination as to whether it was reasonably foreseeable to Defendant that his involvement in the Scheme could create a risk that Mingo Logan would receive a suboptimal price.

*States v. Vinyard*, 266 F.3d 320, 330 (4th Cir. 2001) (finding that the defendant third party's conduct in scheming with an employee to direct the employer's work to their jointly-owned company "violate[d] the honest services doctrine embodied in § 1346 . . . in that it create[d] a clear risk that the employer [would] receive, in terms of price *and quality of work, suboptimal service*" (emphasis added) (citing *deVegter*, 198 F.3d at 1331)); *deVegter*, 198 F.3d at 1331 (finding that there was a reasonably foreseeable risk of economic harm to the employer where the defendant was hired by the employer to recommend an underwriter, the defendant also received bribes from certain underwriters, and this conflict created a risk that the defendant "might not . . . recommend[]" the "best underwriter").

## E.    Specific Intent to Defraud

Returning to the elements that pertain to all mail fraud offenses under Section 1341—rather than those specifically tied to honest-services offenses—the Government must next prove that the defendant "acted with specific intent to defraud." *United States v. Ham*, 998 F.2d 1247, 1254 (4th Cir. 1993) (citations omitted); *see also United States v. Godwin*, 272 F.3d 659 (4th Cir. 2001). "[T]o convict a person of defrauding another, more must be shown than simply an intent to lie to the victim or to make a false statement to him." *United States v. Wynn*, 684 F.3d 473, 478 (4th Cir. 2012) (citation omitted).  Rather, "[t]o be convicted of mail fraud . . . , a defendant must specifically intend to lie or cheat or misrepresent with the design of depriving the victim of something of value," *id.*, such as "money or property . . . or their right to honest services," *United States v. Bereano*, 161 F.3d 3, at *3 (4th Cir. 1998) (citations omitted); *see also United States v. Pitt*, 482 F. App'x 787, 793 (4th Cir. 2012) ("Under an honest-services theory, the Government need only show the defendant had the intent to defraud another of the intangible right of honest

33

services." (citing *United States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008))).   Additionally,

"[t]he scheme or artifice to defraud can be in the form of an assertion of a material falsehood with

the intent to deceive or active concealment of a material fact with the intent to deceive."   *United*

*States v. Pasquantino*, 336 F.3d 321, 333 (4th Cir. 2003) (citation omitted); *see also United States*

*v. Colton*, 231 F.3d 890, 901 (4th Cir. 2000) ("What is essential is proof of a 'scheme or artifice

to defraud,' which can be shown by deceptive acts or contrivances intended to hide information,

mislead, avoid suspicion, or avert further inquiry into a material matter.").   "Thus, fraudulent

concealment—without any misrepresentation or duty to disclose—can constitute . . . fraud." *Pitt*,

482 F. App'x at 790 (alteration in original) (quoting *Colton*, 231 F.3d at 899).

"Fraudulent intent may be inferred from the totality of the circumstances and need not be

proven by direct evidence." *Ham*, 998 F.2d at 1254 (citations omitted).   "In particular, intent

'can be inferred from efforts to conceal the unlawful activity, from misrepresentations, from proof

of knowledge, and from profits." *United States v. Beverly*, 284 F. App'x 36, 40 (4th Cir. 2008)

(quoting *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007)).   "[E]vidence of financial gain

is particularly probative in a fraud case to establish the defendant's intent to defraud." *United*

*States v. Bajoghli*, 785 F.3d 957, 966–67 (4th Cir. 2015) (citations omitted).   Further, "[w]hile the

Government must prove an intent to defraud, it is not necessary for the Government to establish

that the victim actually suffered a loss, only that [the defendant] intended such." *Bereano*, 161

F.3d at *3 (citing *United States v. Barber*, 668 F.2d 778, 784–85 (4th Cir. 1982)).   *See also United*

*States v. Bohonus*, 628 F.2d 1167, 1172 (9th Cir. 1980) ("[I]t is only necessary for the government

to prove that the scheme was calculated to deceive persons of ordinary prudence."), *cert. denied*,

447 U.S. 928 (1980).   Finally, "[i]t is ordinarily reasonable to infer that a person intends the

natural and probable consequences of acts knowingly done or undertaken."  *Oxygene v. Lynch*, 813 F.3d 541, 549 n.4 (4th Cir. 2016) (quoting *United States v. Neiswender*, 590 F.2d 1269, 1274 (4th Cir. 1979)).

In the present matter, the totality of the circumstances presented in the record demonstrate that Defendant held the requisite intent to defraud Mingo Logan.  Specifically, Defendant "knowingly failed to apprise his employer" of the kickbacks, (ECF No. 7 ¶ 3(d)), and actively concealed his participation in the Scheme from his employer, such as by "generally receiv[ing] the cash kickbacks from . . . Roeher at locations away from Mountain Laurel to avoid . . . detection," (ECF No. 5, Ex. B at 2).   Defendant admitted at the factual basis hearing that he understood his fiduciary duty to Mingo Logan to include getting the best deals on crib blocks for the company, not taking kickbacks, and disclosing to Mingo Logan any kickbacks he took.[8]   (*See* ECF No. 11 at 16–17.) Defendant admits to breaching that fiduciary duty to Mingo Logan by admitting the following in the factual stipulation attached to his plea agreement:

> Mr. Lusk, as purchasing agent, provided favorable action to Mr. Roeher and his company by selecting Mr. Roeher's company to provide crib blocks at Mountain Lauren, in exchange for those kickbacks.
> . . .
> Mr. Lusk further concealed and covered up his participation in the scheme from Mingo Logan Coal Company, Arch Coal, and its representatives.

---

[8] The following language is from the transcript of the hearing held on January 19, 2016:

> THE COURT:  I think what we've articulated is that . . . the [fiduciary] duty breached was, A., the defendant knew he had a duty to get the best deal on the crib blocks as the purchasing agent for his employer; B., he understood that he had a duty not to take kickbacks; and, C., that he understood at some level that, if he was taking kickbacks, that would be information that his employer would want to know and that he had a duty to disclose . . . and that, obviously, he breached all of those duties along the way.
> . . .
> Mr. Lusk, I just want to ask you, you just heard me summarize what I think your duties to your employer were, and did you understand those to be your duties at the time that this was happening?
> THE DEFENDANT:   Yes, sir.

(ECF No. 11 at 16–17.)

35

(*See* ECF No. 5, Ex. B at 1–2).   Of course, Defendant also profited from the Scheme by retaining the kickbacks—a total of $230,000 between September 2009 and roughly March 2014, according to Roeher's estimate, (*id.* at 2)—for Defendant's personal use, (ECF No. 7 ¶ 3(d)).   Finally, as discussed at length below, Defendant's participation in the Scheme and the benefit he accrued through the kickbacks were certainly material information to his employer.   Based on Defendant's active concealment of a material fact, Defendant's admission to breaching his fiduciary duty to Mingo Logan, and the profits Defendant derived from the Scheme, the Court finds that the totality of the circumstances supports a factual basis for the element that Defendant held the requisite specific intent to defraud his employer.   *See, e.g.*, *Beverly*, 284 F. App'x at 40 (stating that fraudulent "intent can be inferred from efforts to conceal the unlawful activity . . . and from profits" (citation omitted)).   *See also United States v. Pennington*, 168 F.3d 1060, 1065 (8th Cir. 1999) (noting that "proof of intent to harm may be inferred from the willful non-disclosure by a fiduciary, such as a corporate officer, of material information he has a duty to disclose").

**F.   Materiality of Falsehood**

Under the next requirement for a Section 1341 mail fraud offense, the Government must prove "materiality of falsehood."   *Neder v. United States*, 527 U.S. 1, 25 (1999) (holding that "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes").   A matter is material if (1) "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question;" or (2) "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it."   *Id.* at 22 n.5 (quoting Restatement (Second) of Torts § 538 (Am. Law

Inst. 1977)); *see also United States v. Gillion*, 704 F.3d 284, 296 (4th Cir. 2012) (discussing the requirements for a Section 1341 offense and stating that "[a] misrepresentation is material if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question'" (quoting *Neder*, 527 U.S. at 22 n.5)).

The materiality requirement is clearly satisfied in this case. Mingo Logan allocated purchasing decisions to Defendant through his employment position as a purchasing agent. (ECF No. 5, Ex. B at 1.) Defendant developed a conflict of interest in his purchasing decisions for Mingo Logan through his participation in the Scheme and Defendant failed to disclose this conflict to his employer. (*See id.* at 1–2.) If Defendant had satisfied his fiduciary obligations and disclosed this conflict, Mingo Logan likely would have found this information important and taken any number of actions, such as relieving Defendant of his employment, altering the authority it allocated to Defendant, or terminating or changing its contractual relationship with CM Supply. These facts undoubtedly satisfy the materiality requirement of a mail fraud offense. *See, e.g.*, *United States v. Mauney*, 129 F. App'x 770, 775 (4th Cir. 2005) ("We think it beyond serious dispute that a company is capable of being influenced by knowledge of the fact that its purchasing agent is receiving large kickbacks from suppliers."). *See generally United States v. Gillion*, 704 F.3d 284, 296 (4th Cir. 2012) (stating that, to convict a defendant of mail fraud under 18 U.S.C. § 1341, "the government must show that the defendant *failed to disclose material information* or made material misrepresentations" (emphasis added)); *United States v. Hutcherson*, No CRIM 6:05CR00039, 2006 WL 1875955, at *3 (W.D. Va. July 5, 2006) ("It is hornbook law that material omissions can form the basis for fraud as much as material representations." (citing *United States v. Keplinger*, 776 F.2d 678, 697 (7th Cir. 1985))).

G.      **Use of the Mails**

The final element for a mail-fraud offense under 18 U.S.C. § 1341 is "the use of the mails in furtherance of the scheme." *United States v. Gibbs*, 132 F. App'x 502, 503 (4th Cir. 2005) (citations omitted); *see, e.g.*, *United States v. Loayza*, 107 F.3d 257, 260 (4th Cir. 1997).   Under this interstate-nexus requirement, "the Government must prove that the defendant . . . mailed, or caused to be mailed, anything 'for the purpose of executing such scheme.'" *United States v. Pierce*, 409 F.3d 228, 232 (4th Cir. 2005) (quoting 18 U.S.C. § 1341).   "A person 'causes' the mails to be used when he 'does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended.'" *Id.* (quoting *Pereira v. United States*, 347 U.S. 1, 8–9 (1954)).   "Although [Section 1341] does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, it is enough that the mailing be incident to an essential part of the scheme, or a step in the plot." *Id.* (citations omitted).   "Importantly, 'the use of the mails need not [itself] be an essential element of the scheme.'" *Id.* (alteration in original) (quoting *Schmuck v. United States*, 489 U.S. 705, 710 (1989)).

The interstate-nexus requirement is also satisfied in this case.   After CM Supply delivered crib blocks to Mountain Laurel, it mailed invoices for this work.   (*See* ECF No. 5, Ex. B at 2.) For example, "on or about November 15, 2011," Mr. Roeher "mailed a CM Supply invoice . . . for payment for a load of 1,800 crib blocks, knowing that a portion of the profits was going to be returned to [Defendant] for directing the sale to [Mr. Roeher]." (*Id.*; *see also* ECF No. 1 at 4 (providing the allegation in the Information that, "[o]n or about November 15, 2011, . . . [Defendant], together with Gary Roeher . . . did knowingly cause to be delivered by mail . . . an

38

invoice for crib blocks from CM Supply . . . , which requested reimbursement for 1,800 crib blocks").)   The mailing of these invoices was integral to the Scheme, insofar as it resulted in Arch Coal making payments to CM Supply, which then shared proceeds with Defendant through kickbacks.   Further, the use of the mails was foreseeable to Defendant, as this was the mechanism for CM Supply to send invoices for its ill-gotten services on behalf of Mingo Logan.   Accordingly, the Court finds that Defendant and CM Supply used the mails in furtherance of the Scheme and, correspondingly, this final requirement is met.   *See, e.g.*, *Gillion*, 704 F.3d at 297–98 ("[M]ailings that occur subsequent to the commission of the fraudulent acts by the defendants but which relate to the acceptance of the proceeds of the scheme have been upheld as the predicate for mail fraud convictions." (quoting *United States v. Blecker*, 657 F.2d 629, 636 (4th Cir. 1981))).

In summary, the Court finds that the Government has established each of the numerous elements for the charged honest-services mail fraud offense.   As such, the Court finds that there is a factual basis for Defendant's proposed plea to this charge and this case may proceed.

## *V. Conclusion*

For the foregoing reasons, the Court **FINDS** that there is a factual-basis for Defendant's proposed plea.

**IT IS SO ORDERED**.

39

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:          February 7, 2017

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

40